TRADESMEN'S NATIONAL BANK, Appellant, *v.* GROVE D. CURTIS et al., Respondents.

1. DRAFTS — ACCEPTANCE — CONSIDERATION — PROMISE TO DELIVER GOODS. The consideration for the acceptance of drafts, which were given for the future delivery of coal, does not fail by reason of the non-delivery thereof, since a promise to deliver is sufficient consideration for the acceptance.

2. DISCOUNT — KNOWLEDGE OF CONSIDERATION. The right of a bank to enforce the liability of the acceptor of drafts discounted by it is not affected by its knowledge that the consideration therefor was a promise

to deliver coal in the future instead of an actual delivery, where the drafts were discounted for value before maturity and before a breach of the agreement for the delivery of the coal.

*Tradesmen's Nat. Bank* v. *Curtis,* 38 App. Div. 240, reversed.

(Argued April 2, 1901; decided May 14, 1901.)

APPEAL from a judgment of the Appellate Division of the Supreme Court in the first judicial department, entered March 30, 1899, affirming a judgment in favor of defendants entered upon a verdict and an order denying a motion for a new trial.

The nature of the action and the facts, so far as material, are stated in the opinion.

*Arthur J. Baldwin* for appellant. The evidence introduced by the defendants does not establish that there was a conditional delivery of the drafts. (*Abrey* v. *Cruk,* L. R. [5 C. P.] 37 ; *Pratt & Whitney Co.* v. *A. P. T. Co.,* 50 App. Div. 369 ; *Brown* v. *Spofford,* 95 U. S. 474; *Mead* v. *Nat. Bank,* 89 Hun, 105 ; *Hoare* v. *Graham,* 3 Campb. 56 ; *Adams* v. *Woodley,* 1 M. & W. 374; *Skillen* v. *Richmond,* 48 Barb. 437 ; *Van Fleet* v. *Slidge,* 45 Fed. Rep. 743 ; *Brown* v. *Wiley,* 61 U. S. 442 ; *Payne* v. *Ladue,* 1 Hill, 116.) Information gained by the cashier of the plaintiff as a director of the Natalie Coal Company in New York cannot be imputed to the bank. (*F. D. Nat. Bank* v. *Seymour,* 71 Minn. 81 ; *C. Nat. Bank* v. *Clark,* 139 N. Y. 313 ; *Allen* v. *F. Nat. Bank,* 127 Penn. St. 51 ; *Bank* v. *Dunn,* 6 Pet. 51 ; *Flannagan* v. *C. Nat. Bank,* 56 Fed. Rep. 962 ; *S. Co. Bank* v. *Neass,* 5 Den. 337 ; 3 N. Y. 442 ; *A. S. Bank* v. *Savery,* 82 N. Y. 291 ; *Merchants' Nat. Bank* v. *Clark,* 64 Hun, 179 ; *Morris* v. *Talcott,* 96 N. Y. 100 ; *Shultz* v. *Hoagland,* 85 N. Y. 464.)

*Rufus L. Scott* for respondents. An instrument not under seal may be delivered upon conditions, the observance of which is essential to its validity, as between the parties and those having notice, although the instrument be negotiated. The annexing of such conditions is not a contradiction of the

obligation. (*Higgins* v. *Ridgway*, 153 N. Y. 130; *G. Nat. Bank* v. *Colwell*, 57 Hun, 169; *Benton* v. *Martin*, 52 N. Y. 570; *Homestead Bank* v. *Wood*, 48 N. Y. S. R. 775; *W. Nat. Bank* v. *Wood*, 48 N. Y. S. R. 777; *T.-S. W. Bank* v. *Stearns*, 148 N. Y. 515.) The plaintiff was chargeable with the knowledge of the agreement upon which acceptances in suit were given. (*T.-S. W. Bank* v. *Stearns*, 148 N. Y. 515.)

PARKER, Ch. J. The Natalie Anthracite Coal Company, desiring to secure good paper for discount and at the same time sell some coal, sought out the defendants, composing the firm of Curtis & Blaisdell, and through its Mr. Taylor entered into arrangements with them by which it promised to deliver different grades of coal at prices agreed upon within the period of four months. Thereupon a draft was drawn by the Natalie Anthracite Coal Company upon the defendants for three thousand dollars, payable four months after date, and indorsed by the Natalie Anthracite Coal Company, and across its face the defendants wrote an acceptance thereof, payable at the Nineteenth Ward Bank. This suit involves, also, another draft for twenty-five hundred dollars, in the same form and executed under similar circumstances.

On the day the defendants indorsed their acceptances upon the drafts the Natalie Anthracite Coal Company mailed them in a letter, with various other commercial papers, to the plaintiff requesting it to discount the same and remit the money therefor, which it did. The drafts not being paid at maturity they were duly protested and notice thereof given to these defendants, who refused to pay and this suit was brought. The defendants in their answer thereto, among other matters, alleged in substance and effect that the drafts were accepted "by these defendants on the agreement and condition that coal to the full amount of said drafts should be delivered to these defendants by the said Natalie Anthracite Coal Company before the maturity of said drafts, and the same were payable by these defendants only after the delivery of such

coal;" that the coal has not been delivered, and that such
acceptances are without any consideration whatever; and that
the plaintiff received the drafts so accepted with a full knowl-
edge of the conditions upon which said acceptances were
made.

In so far as the answer contained a statement of the facts,
it was supported by the evidence adduced upon the trial. Its
conclusion, that because the makers of the drafts failed to
deliver the coal as they had promised left the drafts without
any consideration whatever to support the acceptances, was,
of course, erroneous, for the promise of the Natalie Anthra-
cite Coal Company to deliver the coal within four months
was a sufficient consideration to support the promise of the
defendants to pay for the coal at the end of four months,
which promise was made in the form of acceptances of the
drafts payable in that time.

The learned judge who wrote the dissenting opinion at the
Appellate Division insists that the evidence failed to establish
the allegations of fact contained in the answer, in that defend-
ants failed to prove that the plaintiff had knowledge of the
facts and circumstances attending the acceptance of the drafts
by the defendants, his position being that while knowledge of
those facts was brought home to the cashier of the plaintiff,
he was not at the time of receiving such information acting
in behalf of the plaintiff, but was acting as a director of the
Natalie Anthracite Coal Company. We find it unnecessary,
however, to consider that question in the disposition of the
case that we propose to make, and shall assume in the further
discussion (without deciding) that the knowledge which the
cashier acquired while acting as a director of the Natalie
Anthracite Coal Company was the knowledge of the plaintiff.
Therefore we shall consider the defendants as having proved
the facts alleged in their answer; those facts, however, not
only do not constitute a defense, but, on the contrary, when
considered with the other established facts, they constitute the
plaintiff a holder of the drafts in due course. The drafts are
complete and regular upon their face; the plaintiff became the

holder of them before they were overdue ; they had not at that time been dishonored ; the plaintiff in good faith paid value for them, and as the drafts were not due there was no breach of the delivery contracts of the character understood by the plaintiff at the time of the discount by the bank. The Natalie Anthracite Coal Company, therefore, had good title to valid and enforceable drafts, which it turned over to the plaintiff for value, and the mere fact that it had knowledge that the consideration for the acceptances of the drafts was a promise to deliver coal, instead of an actual delivery of coal, in no wise affects its right to enforce its obligation against the defendants so long as a discount was made by it before a breach of the agreement of the Natalie Anthracite Coal Company to make delivery of coal within the time specified.

The learned judge who wrote for the Appellate Division laid down the correct rule of law upon this subject when he said : "It would be no defense to these acceptances that they were given upon an executory contract for the sale of merchandise, even if the plaintiff knew that an agreement existed between the makers and the acceptors that the drafts were not to be enforced until the merchandise was delivered, unless the acceptances were discounted with knowledge of the breach. (*Davis* v. *McCready,* 17 N. Y. 230.)" It was his view that the testimony tended to establish that in the very inception of these acceptances it was in contemplation that they should be discounted by the plaintiff, which through its cashier entered into an agreement with the defendants and the Natalie Anthracite Coal Company, by which the defendants were to give their acceptances upon the condition that they should not be enforceable unless the Natalie Anthracite Coal Company delivered coal to the full amount of such acceptances. The plaintiff was not apprised by the answer that the defendants intended to establish any such defense, nor was the action tried upon the theory that the plaintiff through its cashier was a party to any such agreement. But we shall pass those questions and rest our decision upon the broader ground that there is no evidence in this record which

would permit a jury to find that the plaintiff's cashier entered
into any agreement with the defendants and the Natalie
Anthracite Coal Company that it would not enforce the drafts
in the event of a failure on the part of the coal company to
keep its promise to the defendants to deliver the coal before
the maturity of the drafts. All the evidence assumed to be
sufficient to support the verdict of the jury that the plaintiff
was a party to such an agreement is to be found in a single
sentence in the testimony of the defendant Blaisdell, but
before we come to it a reference should be made to other por-
tions of this testimony. It seems that this method of doing
business between the defendants and the Natalie Anthracite
Coal Company was not a new one. It had been pursued by
them for several years prior to the time of this transaction,
and so far as the record discloses the Natalie Anthracite Coal
Company had always made its promises good and the defend-
ants had always paid their drafts. The witness testified that
"these acceptances were given from time to time; we made
an arrangement with the president of the Natalie Coal Com-
pany; his name was Taylor. The arrangement was made
from time to time as these acceptances were given.   *   *   *
The arrangement with him in regard to those two acceptances
was I refused to give him any more acceptances, and he talked
to me quite a while and told me or reminded me of the way
business had been done, as if the acceptances had not been
fulfilled in the past; why they were taken up, if the coal had
not been delivered on the maturity of the acceptances they
had been taken up, and he says: 'These will be served the
same way' (that is, by the Natalie Anthracite Coal Company),
and still I refused to give him this acceptance, and finally Mr.
Wardrop (the plaintiff's cashier, who was also a director of the
Natalie Anthracite Coal Company) came on here about the
17th or 18th of March, and I met Mr. Wardrop with Mr.
Taylor in the Natalie Coal Company's office. At that time
Mr. Taylor brought in a memorandum which he had and
showed it to Mr. Wardrop, showing just exactly the amount
that the Natalie Coal Company owed Curtis & Blaisdell.

Mr. Wardrop took this memorandum in his hand, and finally he said it would be all right; that they would discount the paper — the acceptance; then Mr. Taylor added: 'If the coal is not delivered, the acceptance will be taken up'" (a promise which meant, of course, that the Natalie Anthracite Coal Company, which was to receive the proceeds of the drafts, would take them up, and not that the bank, which might discount them, should lose the money). " Q. What was said with regard to taking up these drafts, if the coal was not delivered? A. That they would be taken care of. Q. By whom? A. By the Natalie Coal Company or the Tradesmen's National Bank." But for this last answer there would have been no argument made that the Tradesmen's National Bank was in any wise a party to an agreement to the effect that the drafts should be non-enforceable in its hands in case of a failure to deliver the coal. There is not another sentence in the record that suggests that either the bank or its cashier agreed with the defendants that it would not enforce the collection of the paper in the event that they should not receive the coal. The counsel for the plaintiff promptly moved to have the answer stricken out and demanded that the conversation should be given in the exact language of those who had had it; but the court, instead of ruling upon this motion to strike out, said to the witness: "State who said that — who made the statement? A. Mr. Taylor made the statement in regard to taking up these drafts." If the witness had answered that Mr. Taylor made the statement, in view of the form of the question, it would have necessarily included the Tradesmen's National Bank as well as the Natalie Anthracite Coal Company, but he so qualified it as not to give to it that effect; and it will be further noted that he at no time suggested that Mr. Wardrop made any promise either for himself or the bank.

It is quite apparent from the testimony already quoted that the witness did not intend to assert that there was any understanding that the Tradesmen's National Bank should take care of the acceptances. The answer which he made undoubtedly stated his own conclusion at the moment, not a statement of

some one else, and that such was the case is conclusively established by what followed. The motion of the opposing counsel, together with the inquiry of the court, at once apprised both the witness and his counsel that if it were a fact, rather than his conclusion, that the Tradesmen's National Bank was to take care of the acceptances, it was one of no inconsiderable importance and worthy of support by a direct answer to the question of the court, as well as by any other facts or circumstances within the knowledge of the witness. But he made no attempt to support it; on the contrary, he proceeded to testify to facts demonstrating conclusively that he did not understand at the time the conversation took place that the cashier of the Tradesmen's National Bank was attempting to make any agreement whatever for that institution touching the discount or disposition of these drafts. " Q. You knew that the Natalie Coal Company was planning to have these drafts discounted? A. They did not say what they were going to do with them. Still I could not say of my own knowledge whether I know that or not; the only way that I would know it was that as they had all the rest of the drafts discounted I supposed they would go the same way." The effect of the witness' answer, therefore, was that it was not said by any party to that conversation where the drafts should be discounted. Moreover, when he said that the only way that he could know that the drafts were to be discounted was because all the rest had been, and he supposed these were to go the same way, he made it very clear that there was no agreement in his presence as to the disposition to be made of these particular drafts.

Mr. Wardrop and Mr. Taylor, the president of the Natalie Anthracite Coal Company, were also examined as witnesses, and not a hint is to be found in their testimony, or in that of any other witness, tending to show either any promise on the part of Wardrop, or any request on the part of the defendants, that the acceptances should be non-enforceable in the hands of the plaintiff in the event of the failure of the Natalie Anthracite Coal Company to keep its agreement to deliver the coal.

We are of the opinion, therefore, that the record presented no question for the jury.

The judgment should be reversed and a new trial granted, with costs to abide the event.

GRAY, O'BRIEN, HAIGHT, LANDON, CULLEN and WERNER, JJ., concur.

Judgment reversed, etc.