TITLE GUARANTEE AND TRUST COMPANY, Appellant, *v.* MAX PAM, Respondent.

**Bills and notes — action on promissory notes given by maker for construction work done on " cost-plus percentage " basis as work progressed upon understanding that if there were errors in accounts, such errors would be corrected in following payments — discount of such notes by plaintiff having knowledge of that fact — plaintiff not a holder of such notes in due course — negotiation of such notes not a breach of good faith by payee — when defendant has sustained burden of proof required to establish partial defense as to amount due on said notes.**

This action is upon two promissory notes drawn by the defendant to the order of a construction company and indorsed by the payee to the plaintiff for value and before maturity. The construction company had been doing work for defendant in the development of an irrigation project in a western state. Payment was to be made on the basis of " cost-plus percentage." The construction company was to render monthly bills showing the cost to it of the work, to which cost it was to add a commission of five per cent, and against such bills the defendant was to give his promissory notes with interest. The work took much more time than expected and at a cost largely exceeding the estimate. Previous to the notes in question defendant

had given to the construction company notes for the work as it progressed, upon the understanding that if there were errors in the accounts such errors would be corrected in the following payments. These notes were discounted by the plaintiff and the proceeds paid to the construction company and when due were taken up either by cash or by other notes, also discounted by plaintiff. Prior to the time the notes in question were made defendant had been informed that there had been waste and inefficiency in the work on the part of the superintendent of the construction company in charge of the work. When these notes were demanded by the construction company in payment of additional expenditures and in partial renewal of the preceding notes defendant was reluctant to make payment on the notes without examining the accounts. He suggested renewal of the notes, then due, for a year, stating that the accounts must be adjusted when the renewal period had expired, and that defenses were reserved. The president of the construction company had difficulty in obtaining the consent of the finance committee of his company to the proposed arrangement but finally did so and· the old notes were surrendered and the notes in question, covering the old notes and the additional construction work, were made by defendant, given to the construction company, and discounted by plaintiff. Renewal of the notes was refused, the notes were dishonored and this action was brought. Defendant defends upon the ground that the notes had been procured by the construction company through fraud, and because the monthly statements were erroneous; that the delivery of the notes was conditional; that they had been discounted without his consent and that there was fraud in discounting them before the conditions had been satisfied. *Held*, upon examination of the evidence, that the delivery of the notes was not conditional nor the negotiation thereof a breach of faith; but that officers of the plaintiff when they discounted the notes were chargeable with knowledge that such notes were given subject to an adjustment of the accounts for which they were given, it appearing that directors of the plaintiff were also members of the finance committee of the construction company and took part in the discussion which resulted in the agreement as to the subsequent adjustment of accounts, so that it might be assumed that when they, as officers of plaintiff, authorized the discount of the notes they did so with knowledge that they had been given with the understanding that the accounts were contested, and hence, having notice that the sum due upon the notes was the subject of dispute between the maker and the payee, the plaintiff is not a holder in due course. *Held, further,* that the defendant has sustained the burden of proof required to establish the facts as a partial defense and that the decision of the trial court

adjusting the accounts and fixing a certain sum as the reasonable cost of the work for which defendant is liable, crediting him with part payment thereof and finding judgment against him for the balance, is sustained by the evidence and should be affirmed.

*Title Guarantee & Trust Co.* v. *Pam,* 192 App. Div. 268, affirmed.

(Argued December 12, 1921; decided January 31, 1922.)

APPEAL from a judgment of the Appellate Division of the Supreme Court in the first judicial department, entered July 14, 1920, affirming a judgment in favor of plaintiff entered upon a decision of the court at a Trial Term, a jury having been waived.

*Frederick Collin* and *Harold Swain* for appellant.    The findings of fact, namely: " The notes in suit were given, not as· evidence of an indebtedness of a fixed amount, but were given with the distinct understanding that the amount was to be fixed after an investigation into the *bona fides* of the bills rendered and were subject to all the defenses and claims against the notes; " " the Thompson-Starrett Company negotiated the notes in suit in breach of faith; " " the negotiation of the notes in suit was a fraud on the rights of the defendant," are (a) erroneous and illegal and (b) without support in the evidence. (*Ferris* v. *Hard,* 135 N. Y. 354; *Horan* v. *Hastorf,* 223 N. Y. 490; *Fleischmann* v. *Stern,* 90 N. Y. 110; *Rodgers* v. *Clement,* 162 N. Y. 422; *Smith* v. *Coe,* 170 N. Y. 162; *First Nat. Bank* v. *Stallo,* 160 App. Div. 702; *Copans* v. *Dougan,* 217 N. Y. 695; *State ex rel. Barrell* v. *Chrisman,* 2 Ind. 126; *Prindle* v. *Caruthers,* 15 N. Y. 425; *Keteltas* v. *Myers,* 19 N. Y. 231; *Niblock* v. *Sprague,* 200 N. Y. 390; *Moore* v. *Prussing,* 165 Ill. 319; *Burns* v. *Armstrong,* 223 Penn. St. 66.)    Each of the findings to the effect that when plaintiff became a holder of the notes for value it had notice that in the performance of the contract the company was unskillful, negligent

and wasteful, improperly delayed the work, rendered statements of costs containing charges for the purchase of unnecessary and useless supplies, for labor and materials purchased at excessive rates, for expenditures not belonging to the work, and when defendant made and delivered the notes he expressly reserved to himself all rights and claims against said notes, and plaintiff did not take the notes in good faith, and had notice of facts sufficient to put it on inquiry, is unsupported by evidence. (*McCalmont* v. *Lanning*, 154 Fed. Rep. 353; *Thompson* v. *Village of Mecosta*, 141 Mich. 175; *Atlantic State Bank* v. *Savery*, 82 N. Y. 291.)

*William D. Guthrie, Edmund L. Mooney* and *William S. Siemon* for respondent. As between the original parties to a negotiable instrument or as against any person not a holder in due course, proof may always be given as to the actual consideration and such proof does not constitute an oral contradiction of the written obligation. (*Bookstaver* v. *Jayne*, 60 N. Y. 146; *Cowee* v. *Cornell*, 75 N. Y. 91; *Higgins* v. *Ridgway*, 153 N. Y. 130; *Kelso & Co.* v. *Ellis*, 224 N. Y. 528; *Batterman* v. *Butcher*, 95 App. Div. 213; *German-American Bank* v. *Cunningham*, 97 App. Div. 244; *Rockaway Rolling Mill* v. *Ross*, 76 Misc. Rep. 515.) Unless it was duly established by the evidence that the plaintiff was a holder in due course, the notes were subject to the same defenses as the defendant could have interposed had the action been brought by the payee. (*Vosburgh* v. *Diefendorf*, 119 N. Y. 357; *Canajoharie Bank* v. *Diefendorf*, 123 N. Y. 191; *Joy* v. *Diefendorf*, 130 N. Y. 6, 9; *Sproul* v. *Beskin*, 179 App. Div. 275; *Security Bank & Trust Co.* v. *Dery*, 194 App. Div. 572.) If the proofs tended to sustain the finding of fact that the title of the Thompson-Starrett Company was defective within the authoritative definition contained in section 94, the court properly ruled that under section 98 the burden of proof was on

the plaintiff as holder to prove that it acquired the title to the notes in suit as a holder in due course. (*Security B. & T. Co.* v. *Dery,* 194 App. Div. 572.) The title of the Thompson-Starrett Company was defective within the intent and meaning of section 94 of the Negotiable Instruments Law. (*Benton* v. *Martin,* 52 N. Y. 570; *Bookstaver* v. *Jayne,* 60 N. Y. 146; *Juilliard* v. *Chaffee,* 92 N. Y. 529; *Smith* v. *Dotterweich,* 200 N. Y. 299; *Grannis* v. *Stevens,* 216 N. Y. 583; *Pratt & Whitney Co.* v. *Pneumatic Tool Co.,* 50 App. Div. 369; *Andrews & Co.* v. *Hess,* 20 App. Div. 194.) Plaintiff failed to prove that it acquired title to the notes in suit as a holder in due course. (*Joy* v. *Diefendorf,* 130 N. Y. 6; *Canajoharie Nat. Bank* v. *Diefendorf,* 123 N. Y. 191; *Matter of Kindberg,* 207 N. Y. 221.)

CARDOZO, J. The action is upon two promissory notes, drawn by the defendant to the order of the Thompson-Starrett Company, and indorsed by the payee to the plaintiff, for value and before maturity. Both notes are dated November 1, 1912, and are payable a year thereafter. One of them is for $96,733.52 with interest at the rate of six per cent per annum; the other is for $3,094.63 with interest at the same rate. The court, sustaining a partial defense, gave judgment in favor of the plaintiff for $53,150.64, and no more. The plaintiff appealed.

In August, 1911, the Thompson-Starrett Company agreed to construct for the defendant certain works, dams, ditches and dikes, in furtherance of an irrigation project at Uva, Wyoming. Payment was to be made on the basis of " cost plus percentage." The builder was to render monthly bills showing the cost to it of the work at the end of each month, to which cost it was to add a commission of five per cent, and against such bills the defendant was to give his promissory notes with interest at the rate of six per cent per annum, maturing May 1,

1912. The expectation then was that about three months would be the time required for completion. An estimate of the costs, by which, however, the builder was to be in no wise bound, informed the defendant that about $30,000 was the probable outlay. The estimate was changed afterwards by the addition of $8,500 because of extra work. Events did not verify the prophecy either as to cost or as to time. The defendant gave his first notes in November, 1911. One was for $8,613.29; the other for $14,448.09; a total of $23,061.38. In January, 1912, there was a request for a third note of $29,956.18, which brought the expense far above the estimate, with the end not yet in sight. The defendant held back. The builder became urgent. A letter of January 17, 1912, brings the situation vividly before us: " May I suggest that you give us your note for the amount of our statements with the understanding that if before we render a further statement you find any errors in checking up the accounts, such errors shall be corrected in connection with the following payment? What I suggest is that you give us your note for $29,000. We will get the money, and you can take your time to do the checking without inconveniencing us by depriving us of the use of the money we have already laid out." Here was clear notice to the defendant, an experienced and sagacious lawyer, that the note, if given, would be used. He did not misunderstand the notice, but none the less he gave the note. He followed it with a note, dated March 15, 1912, for $14,781.93. The total with interest added was then $72,225.10.

On April 29, 1912, there was a conference between the defendant and Mr. Horowitz, the builder's president. The notes were about to fall due, and the work was still unfinished. The defendant insisted that he must investigate the items of the builder's outlay, and ascertain if they were proper. Without such investigation he was unwilling either to pay the notes or to give others in

renewal.　Mr. Horowitz suggested that he pay $22,225.10 in cash, which would reduce the notes to $50,000, and give a new note for the latter amount, payable November 1, 1912.　In the meantime the investigation might be pursued.　This suggestion was accepted.　The defendant gave his check and note accordingly, and received back the earlier notes, which had been discounted by the plaintiff.　They were stamped by the plaintiff " paid " with the addition of the plaintiff's name, and the defendant saw the stamp, and understood its meaning.　About this time reports came to him from an engineer whom he had sent to Wyoming to inspect the works.　The reports gave warning that there had been inefficiency and waste. The superintendent on the job had been negligent and even corrupt.　But the end had not been reached.　New statements of expenditures came in, and new notes were demanded.　On June 4, 1912, the defendant, in response to these demands, made his note for $11,583.48 payable November 1.　This note and the one for $50,000, which preceded it, were discounted by the plaintiff.　On August 2 the defendant made still another note, this time for $35,150.04, payable like the others on November 1. Before giving this note, which brought the total up to $96,733.52, he had another conference with the builder. He expressed reluctance to give a note in view of the reports of waste.　There followed what was substantially a repetition of the promise of adjustment and reparation which had been given in connection with the notes of May.

In September, 1912, discussion was renewed.　Mr. Horowitz was about to leave for Europe, and the impending maturity of the notes made it desirable that there should be some understanding about renewal.　The defendant again expressed reluctance to make payments on the notes without probing the accounts.　He suggested renewal for a year, coupling the suggestion with the statement that the accounts must be adjusted when

[232 N. Y. 441]    Opinion, per CARDOZO, J.    [Jan.,

the renewal period had expired, and that defenses were reserved. Mr. Horowitz in effect assented, though expressing fear of criticism at the hands of his finance committee. On October 2, 1912, the day before he left for Europe, he met the defendant, and brought the matter up again. He reported that he had succeeded with much difficulty in obtaining the approval of the committee. The old notes were surrendered, and two others, the notes in suit, were given, one for $96,733.52, and the other for $3,094.63, both payable with interest on November 1, 1913. Of the three notes surrendered, two had been discounted by the plaintiff, though there was no stamp upon them to indicate the plaintiff's ownership. The new notes, i. e., those in suit, were discounted by the plaintiff in December, 1912. The defendant says that he knew nothing of the discount then. He learned of it, however, in May, 1913. On May 2, 1913, he sent the builder a check for $2,421.82, in payment of a note which he had given for interest. The check was accompanied by a letter which stated that the payment was without prejudice to any claims or rights with reference to the notes unpaid. The builder, answering this letter, said: " You speak of having rights or claims against the notes held by us. While these notes have been discounted by us, so that no claim can be said to exist against them, I want to assure you that if it develops that your suspicions were well founded, this company will give you its check, and reimburse you for any damage you may have suffered, without regard to the fact that the notes are no longer in our possession." The defendant, though replying promptly to other statements in this letter, made no protest that the negotiation of the notes was a breach of any condition attached to the delivery. The date of maturity arrived. The defendant then proposed renewal for another year upon the same terms as before, still without suggestion on his part that those terms had been disregarded by the discount of the paper. Renewal was

refused; the notes were dishonored; and dishonor was followed by suit.

The trial judge held that the negotiation of the notes was in fraud of the defendant's rights; that the effect of the agreement already stated between the defendant and the payee was to make delivery conditional; that the notes were not to come into being as effective obligations until the bills had been adjusted; that the builder's monthly statements included wasteful and negligent expenditures; that the burden was on the plaintiff, in view of the fraudulent negotiations, to prove itself a holder in good faith; and that not only had it failed to sustain this burden, but the defendant had proved the contrary. The reasonable cost of the work was fixed at $72,644.95. The defendant was credited with part payments and cast in judgment for the balance.

We are unable to accept the ruling that delivery was conditional, and negotiation a breach of faith. No condition was expressed. We think that none is to be implied. The defendant argues that the promise to adjust was of little use if the note could be transferred. It is perhaps a sufficient answer that the note itself was of little use if transfer was forbidden. These arguments would balance each other, to say the least, if the purpose of the transaction were not otherwise revealed. In truth, however, it is revealed in many ways. The evidence is· unmistakable that the defendant permitted and expected the discount of his notes. He was willing to take the chance of a transfer to a holder without notice, relying on the builder's responsibility, and its promise of indemnity, if mistake was afterwards established. When the note of $29,956.18 was demanded in January, 1912, he was already on the watch for waste. On the promise of later adjustment, he made the note, though distinctly informed that discount was intended. We find no· evidence that the delivery of later notes, upon a like

promise of adjustment, was otherwise conditioned. In May, 1912, when suspicions of waste had grown, the old notes were taken back with notice that the payee had passed them over to the plaintiff. Even then, the defendant was satisfied with a repetition by the payee of the promise of adjustment. He said nothing in prohibition of a transfer, though he had no reason to believe that there would be a change in the earlier course of dealing. When a word could have clarified his meaning, he did not choose to utter it. In November came another renewal, but the terms remained unchanged. In the following May, if not before, there was unequivocal notice there there had been a discount of the notes in suit. The defendant gave no word of protest. A few months later he asked that they be renewed again, and still there was no suggestion that there had been misappropriation or diversion. The cumulative force of these circumstances, we think, is irresistible. Their significance did not escape the defendant with his long and wide experience in law and in affairs. The notes were delivered, not conditionally, but as presently operative contracts, with the understanding that the payee was at liberty to use them (*Grannis* v. *Stevens*, 216 N. Y. 583; *Jamestown Business College Assn. Litmited* v. *Allen*, 172 N. Y. 291; *Wood's Sons Co.* v. *Schaefer*, 173 Mass. 443; *Hall* v. *F. N. Bk.*, 173 Mass. 16).

In these circumstances, the promise of adjustment is not provable to change the nature of the contracts evidenced by the notes (*Grannis* v. *Stevens*, *supra*; *Jamestown Business College Assn. Ltd.* v. *Allen*, *supra*). The promise and the complaints that led to it have significance merely as evidence that a dispute had already arisen in respect of the correctness of the monthly bills. So far as the terms and obligation of the paper are concerned, the defendant is in the same position as if nothing had been said at all. On the other hand, if his position is no better, it is certainly no worse. Evidence changing the

contract is one thing. Evidence affecting the reality or extent of the consideration is another. Even without a promise of adjustment, the defendant, when payment was demanded by the builder, was still at liberty to retort that he had made the notes upon the faith of bills which might rightly be assumed to be correct statements of the cost; that when making them, he did not have the proofs of negligence or waste, still less of the precise extent; that he had given warning, though none was necessary, to the effect that payment would not be made if error, already suspected, was afterwards confirmed; that the proofs had since been gained, and liability reduced *pro tanto* (*Kelso & Co.* v. *Ellis*, 224 N. Y. 528). Such overcharges, if proved, would constitute a defense between maker and payee. We have still to determine their effect between the maker and the plaintiff.

The defendant argues that the notes had been procured through fraud because the monthly statements were erroneous. We think the inference of fraud is inadmissible when the transaction is viewed in its totality. The builder made up the monthly statements in good faith, relying upon the reports of agents on the ground. It had paid the money from its treasury; and instead of willfully defrauding, it was itself the victim of a fraud. A different situation might be here if there was evidence of reckless indifference to truth. Nothing of the kind appears. The defendant in giving the notes knew that the payee made no pretense to actual knowledge, but was trusting to reports. Rumors of waste were to be investigated, and the ultimate accounting was to supply the safeguard against loss. In such circumstances, it is idle to contend that the defendant was tricked into the making of the notes as the result of artifice and deceit. His protestations of uncertainty were too vigorous and frequent. Mistake there may have been, in that the outcome of the trial has shown the charges to be excessive. We cannot find that there was fraud.

The field of inquiry is thus narrowed. With fraud eliminated, both in procurement and in use, the infirmity in the paper is reduced to its true proportions. The excessive charges involve either an absence or a failure of consideration, complete or partial, or some defense, which with sufficient accuracy for present purposes, and without dwelling too much upon niceties of nomenclature, may be brought under one or other of those heads. The difference between such a defense and one of fraud is not without importance in determining the position of a purchaser. If there was fraud, the burden is on the purchaser (in this case the plaintiff) to prove a purchase in good faith (Negotiable Instr. Law, sec. 94; *First N. Bank of Cortland* v. *Green*, 43 N. Y. 298). If there was merely absence of consideration or the like, the burden is on the maker, the defendant, to prove a purchase in bad faith (Negotiable Instr. Law [Cons. Laws, ch. 38], sec. 98; *Harger* v. *Worrall*, 69 N. Y. 370; *Mechanics & Traders' Nat. Bk. of N. Y.* v. *Crow*, 60 N. Y. 85). The trial judge found erroneously, as we think, that the delivery of the paper was conditional, and that there was fraud in negotiating it before the condition had been satisfied. He then inverted the burden of proof, and held that it was not for the defendant to show guilt, but for the plaintiff to show innocence.

This error might require a new trial if we could reasonably believe that it controlled the judgment. The record makes it plain that it did not. Both the trial judge and the Appellate Division held that wherever the burden lay, the plaintiff's knowledge of the infirmity in the paper had been affirmatively proved. In such circumstances, the misconception of the burden may be disregarded as immaterial. We have before us a record of fourteen large volumes, comprising 6,534 pages. The trial occupied thirty-seven days. Counsel on each side concede that no other evidence could be produced if the case were tried again. In these conditions, there may well be

liberality and indulgence in determining whether error is so important as to have affected the result. The judgment should stand unless prejudice is clear.

We come then to the question whether the defendant upheld the burden with which he must be charged. The evidence upholding it is slight, but we cannot say that there is none. The plaintiff trust company and the Starrett Company are linked in close alliance. The strength of the tie is attested by this very action. On the dishonor of the notes, the trust company passed over the Starrett Company, the indorser, and brought action against the maker that the indorser might be relieved. Its friendship did not falter in the face of a long and costly litigation; but friendship, however close, is not the equivalent of notice. Many of the directors of the trust company are directors of the Starrett Company also. That again is inconclusive, and merely tends to explain the strength and closeness of the tie. Notice must rest upon knowledge imparted to the officers of the Starrett Company and present in their minds when acting as officers of the trust company in the business of the discount (*Constant* v. *University of Rochester*, 111 N. Y. 604; *Cragie* v. *Hadley*, 99 N. Y. 131; *McCutcheon* v. *Dittman*, 164 N. Y. 355; *The Distilled Spirits*, 11 Wall. 356; *N. Y. Assets Realization Co.* v. *Pforzheimer*, 158 App. Div. 700, 703; *Corrigan* v. *Bobbs-Merrill Co.*, 228 N. Y. 58, 69; *Atlantic Cotton Mills* v. *Indian Orchard Mills*, 147 Mass. 268; *Peninsular Trust Co.* v. *Johnson*, 128 Md. 535, 540; *Cook* v. *American Tubing & W. Co.*, 28 R. I. 41, 76). The question to be determined is whether such knowledge can be found. The burden may be sustained as well by evidence that is circumstantial as by evidence that is direct. We think the inference is permissible that the officers of the trust company who attended to the discount were informed of the controversy in respect of the correctness of the bills while they were acting as members of the finance committee of the Starrett Com-

pany, and informed in such circumstances as to make forgetfulness impossible when they came to act for the plaintiff in the purchase of the paper.

The notes in suit were discounted on December 7, 1912. Mr. Stanley, in co-operation to some extent with Mr. Kelsey, acted for the plaintiff in authorizing the discount. Both Mr. Stanley and Mr. Kelsey were members of the finance committee of the Starrett Company with general, though somewhat indefinite supervision of its finances. The ordinary course of business made it probable, though not certain, that they would learn of the defendant's notes, and of any promise of renewal. Mr. Kelsey says that at a meeting of the finance committee when the notes now in suit were first brought to his attention, he and other members of the committee criticized Mr. Horowitz with vehemence, and were surprised and indignant that the notes had been accepted. He says that this was the first time that he had ever heard of the Pam contract, but here he is contradicted by Mr. Horowitz, who insists that there was knowledge long before. If that is so, the subject of criticism must have been the extension of payment for a year. Mr. Horowitz denies that he ever willfully concealed anything from the committee. He disclaims any willingness to mislead them either by untruths or by half truths or even by silence. It might seem, then, to be incredible that when citicized with indignation for yielding to the defendant's request and granting a long renewal, he did not explain to his critics why the renewal was required. The explanation would have carried with it a disclosure of the controversy which cast a shadow on the notes. The trial judge might accept the admission that the extension of payment was the subject of strenuous debate, and refuse to believe that in the course of the debate the essential features of the transaction were forgotten or ignored (*Becker* v. *Koch,* 104 N. Y. 394; *President, etc., of Manhattan Co.* v. *Phillips,* 109 N. Y. 383; *Sharp* v. *Erie R. R. Co.,*

184 N. Y. 100, 106). In thus holding, we do not impute to any witness a readiness to misstate the facts. Admittedly there came a time when knowledge was acquired. Dates are easily confused with the passing of the years. Especially is this true when the men whose memory is thus tested are absorbed in multifarious and large affairs. In the one scale was the admission that the renewal had been the subject of passionate discussion; in the other the denial that there was any reference to the facts without which discussion, however vehement, must have been meaningless and futile. The trial judge had to weigh these opposing considerations. We have no power, if there is anything supporting his conclusion, to substitute our own.

The question remains whether there is any evidence · that the disclosure of the controversy antedated the discount of the paper. We have testimony that the meeting occurred " about " October, 1912, which might fairly be understood to include the latter part of September. True, this testimony was later changed, and the date fixed as December 19, just twelve days following the discount. It was for the trial judge to say whether the first or the later statement would be accepted as the truth. He might conclude that some of the reasons for the change were not entirely convincing. Mr. Kelsey, in fixing upon the new date, recalls that discussion of the notes in suit was synchronous with the discussion of other notes given by the defendant and an associate in another building venture. Mention of the latter notes is made in the minutes of the meeting of December 19. As to the notes in suit, there is silence. Mr. Kelsey would have it that up to the time of this discussion he had never heard of the defendant's contract. Mr. Horowitz tells us, on the contrary, that the committee had knowledge of the contract from the beginning. So convinced was he of this that he was unwilling to enter upon the minutes a resolution, adopted December 19, which spoke of the

contract as of one just reported and approved. Doubts are multiplied when his testimony is contrasted with declarations out of court. He reported to the defendant on October 2, 1912, that the committee had approved the renewal after lively opposition. He says now that the proposition was not submitted to them at all. His declarations to the defendant may not be evidence against the plaintiff that approval had been asked, but they are not to be ignored in estimating the force of his denial. There is testimony by Mr. Stanley which increases the obscurity. At first he said in substance that the discussion preceded the delivery of the renewal notes. Only later did he remember, as he says, that discussion did not precede, but followed. The trial judge was called upon to unravel as best he could this tangle of uncertainties. He might consider, with other things, the functions of the committee, and the likelihood that it would be consulted in a matter of such moment. Weighing the probabilities, he did not go beyond his province in holding that the first statement of the date was more likely to be accurate than the second, and fixing the time of the disclosure as the beginning of October or the latter part of September, the eve or substantially the eve of Mr. Horowitz's departure. Here again there is no occasion to impute a purpose to mislead. Enough that the question is one of fact, and beyond our power of review.

If there was notice to the finance committee, the inference is permissible that there was notice to the plaintiff. Mr. Kelsey and Mr. Stanley, who were present at the meeting of the committee, were also officers of the plaintiff, and as such attended to the discount. They do not charge the corporation with knowledge merely because they were its officers (*Corrigan* v. *Bobbs-Merrill Co., supra*). They charge it because they were its officers employed in the very transaction of the purchase of the paper, with a duty thus imposed on them to use whatever

knowledge they had for the good of their employer. In such circumstances, it is not material that their knowledge was acquired while acting for another as long as while acting for the plaintiff the facts were present in their minds (*Constant* v. *University of Rochester; Cragie* v. *Hadley; McCutcheon* v. *Dittman; The Distilled Spirits; N. Y. Assets Realization Co.* v. *Pforzheimer; Corrigan* v. *Bobbs-Merrill Co.; Atlantic Mills* v. *Indian Orchard Mills; Peninsular Trust Co.* v. *Johnson; Cook* v. *American Tubing Co., supra*). We have here the necessary concurrence of memory and information. The trier of the facts might not unreasonably believe that what had been learned in one capacity was not forgotten in the other. The acrimony of the debate would tend to make forgetfulness impossible (*The Distilled Spirits, supra*).

One other point made by the plaintiff, though more or less incidentally, deserves a word of mention. The suggestion is thrown out that the plaintiff would be a purchaser in due course though shown to have notice of everything which at the time of the discount was known to the payee. Reliance is placed upon such cases as *Arthurs* v. *Hart* (17 How. [U. S.] 6); *Davis* v. *McCready* (17 N. Y. 230); *Tradesmen's Nat. Bank* v. *Curtis* (167 N. Y. 194); *Commercial Credit Co.* v. *McDonough Co.* (March, 1921, Mass.) (130 N. E. Rep. 179), and *Black* v. *First Nat. Bank of Westminster* (96 Md. 399, 418). We think they are inapplicable here. In these cases, and others like them, paper had been given in consideration of a promise to do something in the future. Until the promise was broken, a defense did not exist. The purchaser was not affected by equities that might never come into being. In this case, the overcharge and the resulting controversy were already existing facts. There was nothing lacking but the evidence. The promise of adjustment if error was discovered before maturity, did not add to the duty which the law would otherwise imply. One who purchases with notice that the sum due upon the instrument is the

subject of dispute between maker and payee, is not a holder in due course (*Lytle* v. *Lansing*, 147 U. S. 59, 71; *Studebaker Mfg. Co.* v. *Dickson*, 70 Mo. 272). He takes the risk of the dispute. He must abide by the outcome whether in his favor or against him.

The judgment should be affirmed with costs.

HOGAN, POUND, CRANE and ANDREWS, JJ., concur; HISCOCK, Ch. J., and McLAUGHLIN, J., dissent.

Judgment affirmed.