THE BANK OF UNITED STATES, Plaintiff, *v.* THE COOPER-BESSEMER CORPORATION, Defendant.

Municipal Court of New York, Borough of Manhattan, Fourth District, December 27, 1932.

*Carl J. Austrian* [*Warren C. Fielding* and *Bernard Fields* of counsel], for the plaintiff.

*Shearman & Sterling* [*Morris F. Goldstein* of counsel], for the defendant.

LEWIS, DAVID C., J.    On July 29, 1929, Eugene E. Cerf was the owner of 600 shares of Cooper-Bessemer cumulative preferred stock, purchased by him in the open market.    On that day Cerf sold the said shares to Walter P. McCaffrey & Co., and thereupon intrusted them to a messenger to make delivery in the usual manner followed in the street.

In the course of delivery these stocks were purloined from the custody of the messenger.    Reports of the theft were made by Mr. Cerf to the police department, and the crime was broadcast over the ticker tape of the New York Curb.

It is not disputed that Mr. Cerf took all reasonable precautions to prevent innocent parties from purchasing these stolen securities (negotiable in their form), and to protect the interests of the owner.

On September 17, 1929, these stolen 600 shares of stock were pledged with the Bank of the United States by one Charles Lee Jones, secretary for Edwin Cole, as collateral for a loan that had been negotiated by Cole, through McKeown and Kelly, respectively manager and assistant manager of the One Hundred and Sixty-seventh street branch of the Bank of the United States.

The Bank of the United States contends that it came into possession of these shares as a pledgee in good faith, for value, without notice of any defect in title.

It is in connection with this contention that the following facts are of import: On March 25, 1929, the said McKeown and Kelly certified two checks, drawn by Cole on the Bank of the United States, each in the sum of $20,000, making a total of $40,000, when his account only boasted of a credit of a few thousand dollars.

These certifications were made in violation of the rules governing such transactions, and, in fact, were made against two uncollected checks drawn by Cole on an out-of-town bank in the sum of $65,000, which were subsequently returned uncollected.

McKeown and Kelly refrained from entering this transaction, involving the certification of the checks of $40,000, and from recording the consequent loss against the account of Cole; and, in fact, concealed the transaction, so far as the books and records of the bank might disclose it.

On May 1, 1929, Cole deposited other collateral with the bank,

obtaining a loan of $4,500. McKeown and Kelly never held this new collateral for the $40,000 loss that the bank had already sustained, and from the records this later loan of $4,500 was paid back on July 29, 1929.

On August 23, 1929, the National City Bank of New York, as transfer agent of the Cooper-Bessemer Corporation, upon a proper bond, issued six certificates of stock in lieu of the allotment certificates which had been stolen.

On December twelfth the Bank of the United States presented the stolen 600 shares and obtained 600 shares in its name, thereby creating an over-issue of the stock.

This plaintiff asserts title to the stock and the right to the dividends payable on it.

The defendant disputes plaintiff's title to the stock — denies its right to the dividends.

The right of the plaintiff to collect the dividends depends upon whether or not the plaintiff has a valid claim to the stock.

Since theft was the origin of the plaintiff's claim to this personal property, ordinarily it could maintain no rights of ownership against the holder of the lawful title. But this stock is endowed by statute with the attributes of a negotiable instrument. (Pers. Prop. Law, §§ 162, 168, 183.)

" Elements of negotiability of certificates of corporate stock, lacking at common law, have been supplied by article VI of the Personal Property Law (Cons. Laws, chap. 41 — Uniform Stock Transfer Act)." (*Turnbull* v. *Longacre Bank*, 249 N. Y. 159, at p. 167.)

The rules that govern the negotiation of such an instrument control the transfer of such stock. The rights and title of the holder of the one, or the possessor of the other, are determined by the same test, and the sole query seems to be whether the plaintiff is a pledgee in good faith. If it is, it can recover. If it is not, it must meet defeat.

One seeks the meaning of the expression " good faith," and then seeks to determine whether the plaintiff has proven itself a transferee in good faith.

The stock having been stolen, the burden rests upon the plaintiff to establish that it acted in good faith, before it can possess the rights of a pledgee in good faith.

" If there was fraud, the burden is on the purchaser (in this case the plaintiff) to prove a purchase in good faith." (*Title Guar. & Trust Co.* v. *Pam*, 232 N. Y. 441, at p. 452.)

" While, after proof had been given on behalf of the defendants that the notes were fraudulently and illegally issued, it became

incumbent upon the plaintiff, in order to succeed, to establish that it had acquired the notes in good faith for value, still the question was solely one of good faith." (*Second Nat. Bank* v. *Weston,* 172 N. Y. 250, at p. 254.)

" The bonds were stolen and it was incumbent on the defendant to show that it was a *bona fide* holder (Neg. Inst. Law, § 98; *Fidelity International Trust Co.* v. *Canalizo,* 211 App. Div. 325), and if defendant's manager had notice \* \* \* if he did not act in good faith in the matter, his bad faith could be imputed to defendant. (*Baruch* v. *Buckley,* 167 App. Div. 113.) " (*Harter* v. *Peoples Bank of Buffalo,* 221 App. Div. 122, at p. 126.) (See, also, *Canajoharie National Bank* v. *Diefendorf,* 123 N. Y. 191, at p. 202.)

To impugn good faith, guilty knowledge is not necessary, though negligence alone is not sufficient. But bad faith, once established, is a fatal omen in these transactions.

And to establish bad faith direct proof is not necessary; circumstantial evidence will suffice.

Bad faith may be born of circumstances; circumstantial evidence swiftly carrying one from pretended ignorance to presumed bad faith; though it may be impossible to definitely show when ignorance turns to doubt and doubt becomes suspicion and suspicion ripens into bad faith.

Hence, when the proof reveals a state of facts incompatible with the existence of good faith, a pretense of ignorance cannot clothe the transaction with immunity nor purge it of its taint.

" These facts and circumstances, and others disclosed by the record, bore directly on the question of Hausle's good faith and honesty in the transaction, and were for the jury." (*Harter* v. *Peoples Bank of Buffalo, supra,* at p. 125.)

" Common prudence, and a decent regard for the rights of those who might be injured by his conduct, required more than this from the least scrupulous of men, and much more it would seem from the managers of a chartered financial institution." (*Canajoharie National Bank* v. *Diefendorf,* 123 N. Y. 191, at p. 199.)

" Those who seek to secure the advantages which the commercial law confers upon the holders of bank bills or negotiable paper, must bring themselves within the conditions which that law prescribes to establish the character of a *bona fide* holder. (*Canajoharie National Bank* v. *Diefendorf, supra,* at p. 201.)

" The issue of fact between the former firm and the plaintiff is whether they had conspired jointly with Coster, Knapp & Co. to rob the customers of that firm of whom the plaintiff was one, or whether *they had knowledge of such facts as should have reasonably*

*caused suspicion when they* received the bonds, and *required of them proper investigation.* * * *

" Mere negligence in taking a negotiable instrument is not enough (*Cheever* v. *Pittsburg, etc., R. R. Co.*, 150 N. Y. 59). There must be bad faith. Actual notice on the part of the transferee of the defect in title is sufficient proof on this point. Less may make a question of fact. Gross carelessness (*Canajoharie Nat. Bank* v. *Diefendorf*, 123 N. Y. 191), knowledge of facts that would create suspicion in the mind of a prudent man (*Seybell* v. *Nat. Currency Bank*, 54 N. Y. 288), circumstances that otherwise fairly raise the question of * * * his conduct in the transaction (*American Nat. Bank* v. *N. Y. Belting, etc., Co.*, 148 N. Y. 698; *Second Nat. Bank* v. *Weston*, 172 N. Y. 250), *permit the inference that his conduct was not innocent.*" (*Kittredge* v. *Grannis*, 244 N. Y. 168, at pp. 177, 178.) (See, also, *American Surety Co.* v. *Palmer*, 211 App. Div. 172; revd. on other grounds, 240 N. Y. 63; *Sabine* v. *Paine*, 166 App. Div. 9; *Karpas* v. *Bandler*, 218 id. 418.)

The statute defines good faith as follows: " A thing is done ' in good faith ' within the meaning of the act, when it is, in fact, done honestly, whether it be done negligently or not." (Pers. Prop. Law, § 183.)

The dishonesty referred to by the statute is not necessarily that which is only to be found in the conviction of or responsibility for a crime.

Justice SWAYNE, in the case of *Murray* v. *Lardner* (2 Wall. 110, 121), says: " The rule may perhaps be said to resolve itself into a question of honesty or dishonesty, for guilty knowledge or wilful ignorance alike involve the result of bad faith."

Chief Judge CHURCH said, in the case of *Dutchess Co. M. Ins. Co.* v. *Hachfield* (73 N. Y. 228), " bad faith is predicated upon a variety of circumstances, some of them slight in character, and others of more significance. * * * A perfectly upright, honest man might sell a bond which had been stolen, and the explanation might prevent even the taint of wrong on his part; while the explanation, although falling far short of proof of actual guilt, might leave upon the mind an apprehension that the author directly or impliedly connived at the wrong, or, at least, he was willing to deal in securities and keep his eyes and ears closed, so that he should not ascertain the real truth."

Taking this situation at its best, the proof reveals that McKeown and Kelly had been educated in the irresponsibility of Cole; that through their conduct he had already defaulted to the bank to the tune of $40,000, and that they had concealed these facts from the bank.

Was this honesty? Or was it not a " reckless indifference to the truth? " (*Title Guar. & Trust Co.* v. *Pam*, 232 N. Y. 441, 451.)

McKeown and Kelly also knew that Cole had no available funds at the time when these securities were pledged, and that there was an attachment against his property. It was for that reason the loan was arranged by them in the name of Jones, the secretary or employe of Cole, though the loan was actually for Cole.

McKeown and Kelly had conducted the preliminaries for this loan, and, though it may be hard to state how much they did know, at least they were specifically advised that Cole did not have title to these securities, and that this stock was not to be sold, and that it belonged to an unknown party, an executor. They knew that, if Cole had any right to it at all, the utmost privilege he possessed was but a limited authority.

Still they took this stock as a pledge, not from Cole, but, according to the recorded transaction, from Jones.

" The fact that he did not know to which one of the customers of the firm it did belong would make no difference. It was enough that he knew that it did not belong to the firm." (*Strickland* v. *Magoun*, 119 App. Div. 113, at p. 117; affd., 190 N. Y. 545.)

" Greater caution in avoiding the most natural information could not have been exhibited by the plaintiff if the cashier had known the notes were obtained by fraud or crime and desired to remain in ignorance of those facts. His conduct indicated something more than negligence." (*Canajoharie National Bank* v. *Diefendorf*, 123 N. Y. 191, at p. 198.)

As a matter of law, an executor would have no sanction to loan stock to another for personal use. And, if the stock was so loaned to Cole, he surely possessed no power to have Jones pledge it for his transaction.

Regardless, therefore, of the larceny of the stock, the loan would be in violation of the law.

Here, then, one scents an additional fatal impediment.

One cannot forget that these people knew each other. They had prior and other dealings with serious consequences, involving transactions of questionable import. Was this an acquaintance that could breed confidence? Were these dealings regular business transactions? I take it that the stability of our entire business life is built on the principles of fair dealing, and that a respect for the banking business, as well as a regard for the rights of innocent parties, rebels against that notion of the law that would characterize this transaction with good faith.

The bank was represented by its experienced and authorized

agents, who could claim neither ignorance of the law nor of the facts, hence enjoyed the bliss of neither.

And the bank had selected these agents, placed them in positions of great responsibility, and greater temptation, and it cannot now disavow their acts nor disown their agency.

The bank, therefore, is chargeable with the knowledge that they secured in the course of their duties, and with their conduct in the performance of such duties. (*Harter* v. *People's Bank of Buffalo, supra; Title Guar. & Trust Co.* v. *Pam, supra.*)

And it is to be noted that the said Cole had been indicted for the theft of 300 shares of United Light and Power Company stock, to which he took a plea of guilty, and that he was brought to court as a witness from Sing Sing Prison pursuant to a writ.

This fact is another element to be considered in connection with the other circumstances on the question of good faith. (*Karpas* v. *Bandler, supra.*)

Here one finds no "innocence abroad." The way in which the transaction was staged, the actors to it, the parts they played, the prologue and the finale, constitute an indictment of good faith.

The court can find neither reason nor right to sustain the claim of the plaintiff.

Judgment for defendant.