**Samuel MALLIS and Franklyn B. Kupferman, Plaintiff-Appellees, Cross-Appellants,**

v.

**BANKERS TRUST COMPANY, Defendant-Appellant, Cross-Appellee.**

Nos. 783, 987, Dockets 82–7734, 79–7780.

United States Court of Appeals, Second Circuit.

Argued Feb. 14, 1983.

Decided Sept. 1, 1983.

Noel W. Hauser, P.C., New York City, for plaintiff-appellees, cross-appellants.

Paul J. Bschorr, New York City (White & Case, New York City, Laura B. Hoguet, Richard G. Greco, Dorothea W. Regal, New York City, of counsel), for defendant-appellant, cross-appellee.

Before LUMBARD, OAKES and NEW-MAN, Circuit Judges.

LUMBARD, Circuit Judge:

This is the third time that we have been asked to review a judgment of the Southern District of New York in this action brought by plaintiffs Samuel Mallis and Franklyn Kupferman to recover losses suffered as a result of what we have termed on a prior review "a somewhat unusual securities transaction." [1] *Mallis v. Bankers Trust Co.,* 615 F.2d 68, 70 (2d Cir.1980), *cert. denied,* 449 U.S. 1123, 101 S.Ct. 938, 67 L.Ed.2d 109 (1981). The present appeal arises from the second trial of this case before Judge Carter, after which, on June 7, 1982, the jury awarded the plaintiffs $106,000 on their claims of federal securities fraud, common law fraud, and negligent misrepresentation. On July 1, ten days after entry of judgment on June 21,[2] defendant Bankers Trust Company, arguing that the evidence was insufficient to support the jury's verdict, moved pursuant to Fed.R.Civ.P. 50(b) & 59(a)(1) for judgment notwithstanding the verdict or, in the alternative, for a new trial. On July 6, plaintiffs, who had requested prejudgment interest in their amended complaint, moved pursuant to Fed.R.Civ.P. 59(e) & 60(a) to amend the judgment to, *inter alia,* include such interest on the jury's award.

On September 29, Judge Carter denied the motions in all respects. Bankers Trust, on October 4, then filed a notice of appeal from both the June 21 judgment and the September 29 order.[3] On October 18, plaintiffs filed a cross-notice of appeal which expressly appealed only from the September 29 order.

Because there was sufficient evidence to support the jury's verdict, rendered after an uncontested charge by Judge Carter which fairly and correctly instructed the jury with respect to the controlling issues, we affirm the judgment against Bankers Trust. However, we conclude that prejudgment interest should have been added to the judgment, and we remand for computation of such interest in accordance with New York law.

## I.

Most of the facts are discussed at some length in our prior opinion directing a new trial.[4] *See Mallis v. Bankers Trust Co.,* 615 F.2d at 71–74. A brief summary of the events leading up to the flawed deal is necessary here for discussion of the relevant issues.

1. Plaintiffs commenced this action in February, 1975 against Bankers Trust Company, a New York banking corporation, and other defendants, alleging violations of, *inter alia,* § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) (1976), and Rule 10b–5, 17 C.F.R. § 240.10b–5 (1982), promulgated thereunder; common law fraud; and negligent misrepresentation. Judge Pollack *dismissed plaintiffs'* claims against all defendants and we reversed the dismissal as to Bankers Trust. *Mallis v. F.D.I.C.,* 407 F.Supp. 7 (S.D.N.Y.1975), *rev'd in part,* 568 F.2d 824 (2d Cir.1977), *cert. dismissed as improvidently granted sub nom. Bankers Trust Co. v. Mallis,* 435 U.S. 381, 98 S.Ct. 1117, 55 L.Ed.2d 357 (1978). On remand, the case was tried before Judge Carter and the jury returned a verdict in favor of Bankers Trust. Finding errors in the charge, in certain evidentiary rulings, and in the district court's failure to submit to the jury the claim of negligent misrepresentation, we reversed and remanded for a new trial. *Mallis v. Bankers Trust Co.,* 615 F.2d 68 (2d Cir.1980), *cert. denied,* 449 U.S. 1123, 101 S.Ct. 938, 67 L.Ed.2d 109 (1981).

2. Although the docket sheet suggests that the judgment was entered on June 18, 1982, the date on which the judgment was filed, the Southern District of New York's Judgment Roll shows that the judgment was entered by the Clerk on June 21, 1982.

3. Bankers Trust's notice of appeal from the June 21 judgment was timely filed since, pursuant to Fed.R.App.P. 4(a)(4), a timely filed post-judgment motion for judgment n.o.v. or a new trial tolls the commencement of the time to appeal for all parties until "the entry of the order denying a new trial or granting or denying any other such motion." Because Bankers Trust's post-judgment motion for judgment n.o.v. or, in the alternative, for a new trial was timely filed ten days after the entry of judgment, *see* Fed.R.Civ.P. 50(b) & 59(b), the appeal period *did not commence* until September 29, 1982, when Judge Carter's order denying the motion was filed and entered.

4. The evidence presented to the jury at the second trial was substantially equivalent to the evidence presented at the first trial.

The focus of this case concerns two large blocks, totaling 40,384 shares, of unregistered Equity National Industries, Inc. securities. The stock had been conditionally issued to Jerome Kates and his wife in August, 1970, pursuant to the acquisition by a wholly-owned shell subsidiary of Equity National of a corporation owned by the Kateses. The condition, stated in an escrow agreement appended to the merger plan, provided in relevant part that the shares must be returned if the Kateses' corporation failed to show a profit for calendar year 1970. A typewritten legend on the back of the two certificates representing the Kateses' Equity National shares cautioned that they were "subject to the terms of an Escrow Agreement . . . ." [5]

The Kateses' corporation showed a net loss for calendar year 1970, and it filed a petition for bankruptcy on February 18, 1971. Between March 1 and April 14, 1971, Equity National sent three letters to Bankers Trust, which had been holding the Equity National stock since late 1970 as collateral on loans to the Kateses, demanding in increasingly urgent terms that the stock be returned pursuant to the escrow agreement.[6] The last letter, dated April 14, 1971, was referred to Nathan Silverman, a house attorney for Bankers Trust. Equity National's demand was soon repeated by one of its attorneys in a telephone conversation with Silverman. After receiving a letter dated April 21, 1971, from Kates' attorney threatening legal action if the stock were returned, Silverman, in a letter to the Equity National attorney dated May 24, 1971, denied Equity National's request.

In early February, 1972, John Fowler, a broker specializing in the placement of unregistered securities, learned that the Kateses owned the unregistered Equity National shares. Fowler was also informed that Kates held 110,000 unregistered shares

of Merck & Co., a blue-chip pharmaceutical manufacturer. Fowler testified by deposition that Kates informed him that he was willing to sell the Merck stock at sixty percent of market value, thereby allowing the buyer to realize a $500,000 or more profit on resale, if the buyer would first purchase the Equity National shares. Fowler then contacted Jack Arnold, an associate of Fowler's and an experienced attorney, who agreed to purchase the Equity National shares in exchange for a share of the profits anticipated from the Merck deal. On February 24, 1972, Arnold, for a downpayment of $25,000, entered into a written agreement with Kates to purchase all the Kateses' Equity National shares for $181,000 and thereby acquired a written thirty day option to purchase the Merck stock, the resale proceeds of which were to be split with Fowler. The closing date for the Equity National purchase was set for February 28, later extended to March 3.

It is undisputed that on February 24, neither Fowler nor Arnold knew that the Equity National stock was worthless. Both Fowler and Arnold testified that prior to the closing date, they had telephoned Equity National's transfer agent, the National Bank of Georgia, and were told that the relevant Equity National certificates had no encumbrances other than those stemming from their unregistered status under the Securities Act of 1933.[7] Arnold also testified that Kates had only showed him a photostatic copy of the front side of the Equity National certificates during the negotiations that led to the purchase agreement but had assured Arnold that the reverse side contained nothing unusual. Fowler testified, however, that on February 25, he telephoned the president of Equity National, C.H. Childs, to inquire whether Equity National would be interested in repurchasing the Kateses' shares. According

---

5. The legend continued:
  [The shares] may not be sold, transferred, pledged or hypothecated except in accordance with such Escrow Agreement, a copy of which may be examined at the office of the Corporation.

6. It is undisputed that Bankers Trust had a copy of the escrow agreement at the time when it took the Kateses' shares as collateral.

7. Because Arnold had died in the interval between trials, his testimony was read at the second trial.

to Fowler, Childs stated that Equity National was suing Kates for return of the shares and that those shares could not be transferred. Fowler recalled that Childs had cautioned: "Bankers Trust will not deliver the stock to you. You check with Bankers Trust. We are suing to get this stock back." Fowler asserted that he immediately called Arnold and informed him of the conversation and that they both met with Kates, who admitted being sued by Equity National but denied that the specific shares he was selling were involved. Arnold, though conceding that he was present at the meeting with Kates and Fowler, denied that he was told of Fowler's conversation with Childs. Fowler then telephoned the National Bank of Georgia and again was told that there were no unusual restrictions on the shares. Fowler also testified that he telephoned Silverman on February 28, and, after telling Silverman some of the details of his conversation with Childs (though he did not inform Silverman that it was Childs who gave him this information), Silverman answered that he knew of no litigation concerning the Equity National shares and stated: "You come up with money and we will deliver the stock."

Now enter the plaintiffs Mallis and Kupferman, brothers-in-law and both practicing dentists. Arnold, who was acting as an attorney for Mallis in an unrelated securities transaction, met with Mallis on March 1 to discuss this matter. During the meeting, Arnold, who stood to lose the Merck stock option and the $25,000 deposit if he did not raise the additional $156,000 required to close the purchase of the Equity National shares, told Mallis the broad outlines of the deal with Kates and, without mentioning the Merck stock, commented that the deal would bring "skyscraper[ ]" profits. Arnold then offered to pay $50,000 if Mallis would finance the balance of the deal.

Mallis relayed this information to Kupferman, who also became interested in the deal. Plaintiffs had never heard of Equity National prior to this time. They knew nothing about its line of business, earnings, or management; they knew only that the stock being sold was unregistered. On March 2, Kupferman sought financing from Franklin National Bank through his business and social acquaintance John Murfitt, then an Assistant Vice-President at Franklin National and manager of the bank's Uniondale branch. Desiring additional information, Murfitt called Arnold and Silverman. Murfitt testified that Silverman told him that the Equity National stock was "negotiable and saleable." Silverman denied this conversation. After these conversations, Murfitt agreed that Franklin National would lend plaintiffs the necessary $156,000.

On the morning of March 3, the closing day, plaintiffs obtained the loan from Franklin National, and in response to Mallis' concern for further assurance of repayment, Arnold sent Mallis a letter, which Mallis later approved, confirming the plaintiffs' "participation" in the Equity National deal and offering the Equity National stock to Mallis as collateral for Arnold's obligation to pay "within thirty days or less . . . the funds advanced by you plus a profit of fifty ($50,000.00) thousand dollars."[8]

The sale of the Equity National shares occurred at Bankers Trust in the afternoon of March 3. Present were Arnold, Fowler, Kates, Silverman, and Murfitt. Plaintiffs did not attend the closing. There was conflicting testimony whether they were represented by Murfitt, Arnold, or both Murfitt and Arnold. Plaintiffs did testify, however, that they both instructed Murfitt, who was carrying Franklin National checks in the amount of $156,000, not to disburse the loan proceeds unless he was satisfied as to the bona fides of the transaction. Silverman produced the Equity National certificates from a file which contained some or all of the correspondence sent by Equity National to Bankers Trust and which, as Silverman conceded at trial, may also have contained a

---

**8.** The letter indicated that the proceeds of the forthcoming Merck deal were to be used to satisfy Arnold's obligation to Mallis.

copy of the escrow agreement. Both Arnold and Murfitt expressed concern about the meaning of the legend on the certificates' back side making them "subject to ... an Escrow Agreement ...." According to Silverman and Kates, the escrow agreement was not available and could not be obtained for about ten days. Arnold testified that they both asserted, however, that these certificates had been released from escrow and were saleable. Silverman never admitted making such a statement. It was then suggested that the problem could be overcome if Kates signed an affidavit with respect to the removal of restrictions on sale. Arnold and Silverman dictated an affidavit to that effect, which was signed by Kates before a bank notary. The transaction thus closed, with Bankers Trust receiving $45,000, the unpaid balance of its loans to the Kateses which otherwise was to have been paid in installments over the next seven years. Kates received the balance of $111,728. During the closing, Silverman never mentioned or produced any of the other documents, kept in the same file that held the stock certificates, which were relevant to the Equity National shares.

Following the closing, Arnold and Fowler attempted to exercise the option to purchase the Merck stock. It was then learned that not only were the Equity National shares worthless but that Kates never owned any Merck stock. Arnold subsequently paid $50,000 to plaintiffs, leaving them with a loss of $106,000.

Plaintiffs then sued alleging that Bankers Trust had engaged in federal securities fraud, common law fraud, and negligent misrepresentation at the March 3, 1972 closing by misrepresenting or not disclosing to plaintiffs' representative the true condition of the Equity National shares. At the second trial the jury returned a verdict for plaintiffs on each of their claims and awarded them $106,000.

## II.

Contending that the evidence was insufficient to support the jury's verdict, Bankers Trust appeals from the judgment and from Judge Carter's denial of its post-judgment motion for judgment n.o.v. or, in the alternative, for a new trial. Specifically, Bankers Trust asserts that the testimony at trial showed that plaintiffs were chargeable with imputed knowledge of the Equity National shares' true condition prior to the closing and consequently the evidence does not support a finding of justifiable reliance, an essential element of each of the three claims submitted to the jury. *See, e.g., Ply-Gem Industries, Inc. v. Green,* 503 F.2d 1362, 1365 (2d Cir.1974) (federal securities fraud claim and related pendent state claims were without merit where plaintiff had knowledge of all the facts alleged to be fraudulently not disclosed); *see also* W. Prosser, The Law of Torts § 108, at 714 (4th ed. 1971). Moreover, Bankers Trust contends that it was error for Judge Carter to consider the age of the case in his decision denying its request for a new trial. We agree with Judge Carter that the evidence was sufficient to sustain the verdict, and although we conclude that the age of a case is not a relevant factor to a new trial determination, we nonetheless affirm Judge Carter's denial of post-judgment relief.

### A. *Judgment N.O.V.*

█ The guiding standard to be applied in deciding whether judgment n.o.v. is warranted is "whether the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable men could have reached." *Mattivi v. South African Marine Corporation, "Huguenot",* 618 F.2d 163, 167 (2d Cir.1980) (quoting *Simblest v. Maynard,* 427 F.2d 1, 4 (2d Cir.1970)). Simply stated, judgment n.o.v. should be granted only when

(1) there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or (2) there is such an overwhelming amount of evidence in favor of the movant that

reasonable and fair minded men could not arrive at a verdict against him.

*Id.* at 168; *see Unijax, Inc. v. Champion International, Inc.,* 683 F.2d 678, 684 (2d Cir.1982); *Howes v. Great Lakes Press Corporation,* 679 F.2d 1023, 1030 (2d Cir.), *cert. denied,* —— U.S. ——, 103 S.Ct. 452, 74 L.Ed.2d 605 (1982). Judge Carter held that Bankers Trust "cannot meet that standard." We agree.

■ One of the principal issues at trial was whether or not knowledge that the Equity National stock was worthless could be imputed to plaintiffs in light of the knowledge which was conveyed to Fowler in his February 25, 1972 telephone conversation with Childs. Bankers Trust contends that there is overwhelming evidence that Arnold, who either was told by Fowler of the Childs conversation or had imputed knowledge of that conversation on account of his relationship with Fowler,[9] was acting as plaintiffs' agent, and thus it argues that plaintiffs had imputed knowledge of the Equity National shares' condition. *See Farr v. Newman,* 14 N.Y.2d 183, 187, 250 N.Y.S.2d 272, 199 N.E.2d 369 (1964) ("principal is bound by notice to or knowledge of his agent in all matters within the scope of his agency although in fact the information may never have been communicated to the principal"); *Title Guarantee & Trust Co. v. Pam,* 232 N.Y. 441, 456–57, 134 N.E. 525 (1922). We cannot agree.

■ There was sufficient, if not substantial, evidence that Arnold was not plaintiffs' agent, at least not for the purpose of determining whether the Equity National stock was saleable. Although Mallis' testimony and other evidence did suggest that Arnold was plaintiffs' agent at the closing, this testimony must be read against Mallis' further testimony that he believed that Arnold, as an attorney, had a professional obligation to insure that the deal was proper and that Arnold's only real duty to be performed for plaintiffs at the March 3, 1972 closing was to collect the relevant papers, including the stock certificates, and deliver them to plaintiffs pursuant to their written agreement. On the other hand, Arnold testified that he was not acting for plaintiffs who he believed were represented by Murfitt, and both Mallis and Kupferman testified that it was Murfitt, and not Arnold, who had been instructed by them not to turn over the loan proceeds unless he was assured of the bona fides of the deal. Moreover, the evidence showed that plaintiffs and Arnold had conflicting interests in the deal: plaintiffs' concern was whether the security for their loan, *i.e.,* the Equity National shares, was good, while Arnold, who had less concern as to the value of the Equity National shares since the purchase of such shares was merely the first step to the highly advantageous purchase of the Merck stock, needed plaintiffs' money in order to meet the closing deadline and assure that the $25,000 deposit would not be forfeited.[10] Accordingly, viewing the evidence in the light most favorable to the prevailing party, which is required in judgment n. o. v. determinations, *Unijax, Inc. v. Champion International, Inc.,* 683

9. It is a basic tenet of the law of agency that the knowledge of an agent, or for that matter a partner or joint venturer, is imputed to the principal. *See Farr v. Newman,* 14 N.Y.2d 183, 187, 250 N.Y.S.2d 272, 199 N.E.2d 369 (1964); *Bonham v. Coe,* 249 A.D. 428, 436, 292 N.Y.S. 423 (4th Dep't), *aff'd,* 276 N.Y. 540, 12 N.E.2d 566 (1937); Restatement (Second) of Agency § 272 (1958). Although plaintiffs argue that Fowler was not Arnold's agent in the Equity National deal and that the two were not partners or joint venturers, a review of Fowler and Arnold's uncontested testimony shows the contrary.

10. We note that even if Arnold was plaintiffs' agent, Arnold's knowledge of the true condition of the Equity National stock would not as a matter of law be imputed to plaintiffs if Arnold's interests in the deal were in fact adverse to those of plaintiffs. *See Marine Midland Bank v. John E. Russo Produce Co.,* 50 N.Y.2d 31, 43–44, 427 N.Y.S.2d 961, 405 N.E.2d 205 (1980) (the premise forming the basis of the imputation principle—*i.e.,* that an agent will live up to the duty to act in the principal's interest in light of all pertinent information he has acquired—"crumbles when the agent has an interest adverse to the purported principle"); *Hartford Accounting & Indemnity Co. v. Walston & Co.,* 21 N.Y.2d 219, 225–26, 287 N.Y.S.2d 58, 234 N.E.2d 230 (1967).

F.2d at 684; *Howes v. Great Lakes Press Corporation,* 679 F.2d at 1030, we conclude that there was sufficient evidence for the jury, which was fully and fairly instructed on the agency theory, to find that Murfitt, not Arnold, was plaintiffs' representative for the purpose of insuring that the deal was proper. *See Saloomey v. Jeppesen & Co.,* 707 F.2d 671, 677 (2d Cir.1983) ("judgment notwithstanding the verdict should [be] granted only if there was but one conclusion reasonable people could have reached—in appellant's favor").

■ Bankers Trust also contends that Fowler and Arnold's knowledge was imputed to plaintiffs on the "*uncontested* evidence" that plaintiffs were joint venturers with Fowler and Arnold in the deal with Kates. This argument is without any merit. Contrary to Bankers Trust's assertion, the uncontested evidence shows that plaintiffs could not be considered joint venturers with Fowler and Arnold. Under New York law, the crucial element of a joint venture is the existence of "a mutual promise or undertaking of the parties to share in the profits ... *and submit to the burden of making good the losses.*" *Steinbeck v. Gerosa,* 4 N.Y.2d 302, 317, 175 N.Y.S.2d 1, 151 N.E.2d 170 (emphasis in original), *appeal dismissed,* 358 U.S. 39, 79 S.Ct. 64, 3 L.Ed.2d 45 (1958); *see Buchner v. Pines Hotel, Inc.,* 87 A.D.2d 691, 692, 488 N.Y.S.2d 870 (3d Dep't 1982), *aff'd mem.,* 58 N.Y.2d 1019, 462 N.Y.S.2d 436, 448 N.E.2d 1347 (1983); *Demian, Ltd. v. Charles A. Frank Associates,* 671 F.2d 720, 723 (2d Cir.1982). The testimony at the trial and the March 3, 1972 letter from Arnold to Mallis evidencing their agreement clearly show that Arnold's promise to reimburse the funds advanced by plaintiffs and pay them an additional $50,000 was fixed and unconditional. The fact that Arnold's letter indicated that repayment was to be made from the anticipated profits of the Merck deal, *see supra* note 8, cannot by itself lead to a conclusion that plaintiffs' right to reimbursement and to the $50,000 depended on the success of the Merck deal. Accordingly, as plaintiffs' participation did not require them to share in the losses, they cannot be deemed joint venturers with Fowler and Arnold.

■ Finally, there was sufficient evidence for the jury to find that the element of justifiable reliance was satisfied even if the knowledge of Fowler's conversation with Childs could be imputed to plaintiffs. Both before and, in Fowler's case, after the Childs conversation, Fowler and Arnold were told by the National Bank of Georgia, Equity National's transfer agent, that the only restrictions on the Equity National shares were those imposed by the securities laws. Moreover, Childs' remarks were again contradicted when, following his statement to Fowler that Bankers Trust would corroborate his warnings, Fowler called Silverman and was told that there were no problems with the shares. Although we doubt that reliance on such statements was justified in light of the clear warnings given by Childs, Equity National's president, we believe that there was sufficient evidence for a jury to reach a contrary conclusion. *See Tennant v. Peoria & Pekin Union Railway,* 321 U.S. 29, 35, 64 S.Ct. 409, 412, 88 L.Ed. 520 (1944) ("Courts are not free to reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more reasonable."); *see also Lavender v. Kurn,* 327 U.S. 645, 653, 66 S.Ct. 740, 744, 90 L.Ed. 916 (1946).

Accordingly, we agree with Judge Carter's denial of Bankers Trust's motion for judgment n. o. v.

### B. *New Trial.*

■ Bankers Trust complains that Judge Carter improperly denied its motion for a new trial when, considering the fact that the case was then seven years old, he ruled that "the fair administration of justice requires that this case remain unsettled no longer." [11] We agree that the age of the

---

11. We recognize that there are substantial doubts as to our power to overrule a trial judge's discretionary decision not to grant a new trial on a claim that the verdict is against

case is not a relevant consideration on a motion for a new trial. However, because we do not think that Judge Carter's denial of a new trial was principally based on that consideration, and because he made no finding and we can find no basis for holding that there were any reasons to set aside the jury's verdict, we affirm his denial.

■ Judge Carter's brief opinion states in pertinent part:

> While my own view of the evidence accords with that of the defendant, the jury undoubtedly did not believe that Arnold represented plaintiffs at the closing or that he had knowledge of the facts which defendant allegedly misrepresented.

> .    .    .    .    .

> The alternative motion for a new trial brings into play other considerations, chief of which is the court's duty to prevent a miscarriage of justice. See Bevevino v. Saydjari, 574 F.2d 676, 684 (2d Cir.1978). Under other circumstances I would be inclined to grant defendant's motion, however, this case is seven years old and the recent trial is its third.[12] It has been appealed to the United States Supreme Court once, and the Court of Appeals twice and may be headed there for a third time. Although I have serious doubts about the verdict, the fair administration of justice requires that this case remain unsettled no longer. Accordingly, the motion is denied.

Although Judge Carter says that "under other circumstances [he] would be inclined to grant defendant's motion," he mentions no fact which would support the grant of a new trial. The circumstances ordinarily recognized as supporting a new trial are

that the jury has reached "a seriously erroneous result" or that the verdict is a "miscarriage of justice," Bevevino v. Saydjari, 574 F.2d 676, 684 (2d Cir.1978), i.e., that the verdict is against the weight of the evidence, that the damages awarded were excessive, or that for stated reasons the trial was not fair to the moving party. See Montgomery Ward & Co. v. Duncan, 311 U.S. 243, 251, 61 S.Ct. 189, 194, 85 L.Ed. 147 (1940); 11 C. Wright & A. Miller, Federal Practice and Procedure §§ 2805–10, at 37–77 (1973). None of these circumstances were found by the trial judge, and in our search of the record we have found no evidence of any reason which would warrant the grant of a new trial. Indeed, all that the trial judge has done here is to say that as the trier of facts he would have reached a result different from that reached by the second jury. It is well settled that a trial judge's disagreement with the jury's verdict is not sufficient reason to grant a new trial. See Saloomey v. Jeppesen & Co., 707 F.2d at 679; Bevevino v. Saydjari, 574 F.2d at 684–85; see also Fireman's Fund Insurance Co. v. AALCO Wrecking Co., 466 F.2d 179, 187 (8th Cir. 1972); 11 C. Wright & A. Miller, supra, § 2806, at 46.

■ Nor was the age of this litigation, over seven years old by September, 1982, any reason for denying a new trial. The passage of time in a closely contested litigation is due in large part to factors over which the parties have little control. Here, most of the elapsed time was consumed in exercising rights to appellate review. Following our reversal of the district court's order dismissing the complaint as to Bankers Trust, 568 F.2d 824 (2d Cir.1977), the

---

the weight of the evidence. See Bevevino v. Saydjari, 574 F.2d 676, 686 n. 30 (2d Cir.1978); Compton v. Luckenbach Overseas Corporation, 425 F.2d 1130, 1132–33 & n. 2 (2d Cir.), cert. denied, 400 U.S. 916, 91 S.Ct. 175, 27 L.Ed.2d 155 (1970); Portman v. American Home Products Corporation, 201 F.2d 847, 848 (2d Cir. 1953); 11 C. Wright & A. Miller, Federal Practice and Procedure § 2819, at 120–27 (1973). However, the denial of a new trial may be reviewed where the trial court fails to exercise its discretion as a result of legal error. 6A J.

Moore, Moore's Federal Practice ¶ 59,15[3], at 59–330 (1982); see Phillip v. Mayer, Rothkopf Industries, 635 F.2d 1056, 1063 (2d Cir.1980); Bevevino v. Saydjari, 574 F.2d at 683–87.

12. Actually, the "recent trial" Judge Carter was referring to was the case's second. Judge Carter apparently was commenting on the fact that the case had been dismissed once and tried twice. See supra note 1.

Supreme Court granted certiorari and then vacated certiorari ten months later as having been improvidently granted. 435 U.S. 381, 98 S.Ct. 1117, 55 L.Ed.2d 357 (1978). A trial was held in May, 1979, resulting in a verdict for Bankers Trust. We reversed in January, 1980, ordering a new trial, 615 F.2d 68 (2d Cir.1980), and the Supreme Court denied certiorari a year later in January, 1981. 449 U.S. 1123, 101 S.Ct. 938, 67 L.Ed.2d 109 (1981). A new trial was held in June, 1982. In any event, neither Bankers Trust nor the plaintiffs can be charged with any undue delay.

Although the passage of time, by itself, is a consideration which should not have been given any weight in denying the new trial motion, we fail to see how Judge Carter's mention of it requires reversal or even a remand for clarification or reconsideration. The district court could only reach the same result on this record. *See Bevevino v. Saydjari,* 574 F.2d at 686–87 (upholding denial of new trial motion even though trial judge mentioned irrelevant factor in denying motion where trial judge failed to find any circumstances justifying new trial and we agreed that none existed).

### III.

■ Finding no merit in Bankers Trust's arguments to the contrary, we agree with the plaintiffs that they are entitled to prejudgment interest on their pendent state law claims.[13]

Noting that the plaintiffs concede that their motion to amend the judgment to include prejudgment interest, filed sixteen days after the judgment's entry, was not timely filed under Fed.R.Civ.P. 59(e) ("A motion to amend the judgment shall be served not later than 10 days after entry of judgment."), Bankers Trust contends that the motion was properly denied because (1) Judge Carter's error, if any, was not a clerical error under Fed.R.Civ.P. 60(a) ("Clerical mistakes in judgments . . . may be corrected by the court at any time . . . ."), and (2) such error, if any, was not the type of "mistake" contemplated by Fed.R.Civ.P. 60(b)(1) ("[T]he court may relieve a party from a final judgment . . . for . . . mistake. . . . The motion shall be made within a reasonable time, and for reasons [in subpart (b)(1)] not more than one year after the judgment. . . ."). Bankers Trust argues, therefore, that since plaintiffs' cross-notice of appeal expressly appealed only from the denial of their post-judgment motion and not from the underlying judgment, we cannot reach the merits of plaintiffs' claim if Bankers Trust is in fact correct in its interpretation of Fed.R. Civ.P. 60(a) & 60(b)(1). We disagree.

■ Plaintiffs' cross-notice of appeal was in fact filed within the period for appealing directly from the judgment.[14] Thus, if the notice had been expressly denominated as an appeal from the judgment, their claim for prejudgment interest would be a proper issue on direct appeal notwithstanding the basis or propriety of their post-judgment motion. *See* 6A J. Moore, Moore's Federal Practice ¶ 60.06[4], at 4068 (1971) ("where . . . the failure to include interest resulted from an error of law, then

---

13. Because the applicability of state law depends on the nature of the issue before the federal court and not on the basis for its jurisdiction, *Maternally Yours, Inc. v. Your Maternity Shop, Inc.,* 234 F.2d 538, 540 n. 1 (2d Cir. 1956); 1A J. Moore, Moore's Federal Practice ¶ 0.305[3], at 3047–50 (1978), state law applies to questions of prejudgment interest on the *pendent claims in an action predicated upon* violations of the federal securities laws. *Marx & Co. v. Diners' Club, Inc.,* 405 F.Supp. 1, 3 (S.D.N.Y.1975), *aff'd in relevant part,* 550 F.2d 505 (2d Cir.), *cert. denied,* 434 U.S. 861, 98 S.Ct. 188, 54 L.Ed.2d 134 (1977).

14. Pursuant to Fed.R.App.P. 4(a)(4), a timely filed post-judgment motion for judgment n.o.v. or for a new trial tolls the commencement of *the appeal period for all* parties until the entry of the order disposing of the motion. Because Bankers Trust's post-judgment motion for such relief was timely filed, *see supra* note 3, the appeal period was tolled until September 29, 1982, the date on which Judge Carter decided all the motions. Accordingly, plaintiffs' October 18, 1982 cross-notice of appeal from the September 29 order denying their motion to amend the judgment was in fact filed within the period in which the underlying judgment *could also be appealed.*

relief may be had ... by motion under Rule 59 and within its short limits [or] by appeal"). *Compare Scola v. Boat Frances, R., Inc.,* 618 F.2d 147 (1st Cir.1980) (defendant was compelled to attempt to use Fed.R. Civ.P. 60(a) & 60(b)(1) as vehicles for its argument that prejudgment interest was erroneously added since appeal period from judgment had expired), *and Lee v. Joseph E. Seagram & Sons, Inc.,* 592 F.2d 39 (2d Cir.1979) (plaintiffs' attempt to request prejudgment interest could only be made, if at all, under Fed.R.Civ.P. 60(a) & 60(b)(6) since almost two years had elapsed since entry of judgment), *with Newburger, Loeb & Co. v. Gross,* 611 F.2d 423 (2d Cir.1979) (appellate court able to consider question of prejudgment interest on timely direct appeal from district court's decision as to damages). We believe, however, that plaintiffs' failure expressly to indicate an appeal from the underlying judgment is not fatal to our hearing on direct appeal their complaint about the judgment. *See Wheatley v. Beetar,* 637 F.2d 863, 864 n. 1 (2d Cir.1980) ("[A]ppellate courts may consider an appeal of only the denial of a Rule 59 motion as harmless error and treat the appeal as being from the underlying judgment when such an appeal would be timely.") (quoting *Serzysko v. Chase Manhattan Bank,* 461 F.2d 699, 701 (2d Cir.), *cert. denied,* 409 U.S. 883, 93 S.Ct. 173, 34 L.Ed.2d 139 (1972)). The requirement of Fed.R.App.P. 3(c) that the notice of appeal "shall designate the judgment, order or part thereof appealed from" serves as "a means of identification, and not as a step in appellate pleading." *Bancroft Navigation Co. v. Chadade Steamship Co.,* 349 F.2d 527, 528 (2d Cir.1965) (construing Fed.R.Civ.P. 73(b), the predecessor of Fed.R.App.P. 3(c)); *see also Franks v. United States Lines Co.,* 324 F.2d 126, 127 n. 1 (2d Cir.1963). Thus, "a mistake in designating the judgment appealed from is not invariably fatal as long as the intent to appeal from a specific judgment can be fairly inferred." *Daily Mirror, Inc. v. New York News, Inc.,* 533 F.2d 53, 56 (2d Cir.), *cert. denied,* 429 U.S. 862, 97 S.Ct. 166, 50 L.Ed.2d 140 (1976); *see also Bankers Trust Co. v. Mallis,* 435 U.S. at 386, 98 S.Ct. at 1120 (the rules of procedure "should be

interpreted to prevent loss of right to appeal, not to facilitate loss") (quoting 9 J. Moore & B. Ward, Moore's Federal Practice ¶ 110.08[2], at 120 (1970)); *Foman v. Davis,* 371 U.S. 178, 179, 83 S.Ct. 227, 228, 9 L.Ed.2d 222, 181 (1962) ("It is too late in the day and entirely contrary to the spirit of the [federal rules] for decisions on the merits to be avoided on the basis of ... mere technicalities."). Although plaintiffs' cross-notice of appeal was technically defective as an appeal from the judgment, we cannot see how the notice of appeal from the denial of their motion to amend the judgment to include prejudgment interest could have conveyed anything to Bankers Trust other than plaintiffs' dissatisfaction with the underlying judgment. *See Bancroft Navigation Co. v. Chadade Steamship Co.,* 349 F.2d at 528–29. Accordingly, we treat plaintiffs' appeal as being from the underlying judgment and thus need not reach Bankers Trust's arguments concerning Fed.R.Civ.P. 60(a) & 60(b)(1).

Bankers Trust next appears to argue that although plaintiffs requested prejudgment interest in their amended complaint, their failure to request jury instructions to that effect or to object to the instructions as given, which were devoid of any mention of prejudgment interest, constituted a waiver of that claim. This contention is without merit. Plaintiffs seek prejudgment interest pursuant to § 5001(a) of New York's Civil Practice Law and Rules, N.Y.Civ.Prac.L. § 5001(a) (McKinney 1963), which provides that prejudgment interest "shall be recovered upon a sum awarded ... because of an act or omission depriving or otherwise interfering with title to, or possession or enjoyment of, property...." New York courts have long held that interest is recoverable as a matter of right in such cases, *see, e.g., Flamm v. Noble,* 296 N.Y. 262, 268, 72 N.E.2d 886 (1947); *Harmon & Regalia, Inc. v. City of New York,* 286 A.D. 825, 141 N.Y.S.2d 877 (1st Dep't 1955), and it is clear that § 5001 codifies those decisions. *See, e.g., Buffalo Oil Terminal v. William B. Kimmins & Sons,* 42 Misc.2d 499, 501, 284 N.Y.S.2d 499

(Sup.Ct.1964), *aff'd mem.*, 23 A.D.2d 970, 260 N.Y.S.2d 621 (4th Dep't 1965); 5 J. Weinstein, H. Korn & A. Miller, New York Civil Practice ¶ 5001.05, at 50–18 to –19 (1982); *see also Mount Sinai Hospital v. Borg-Warner Corporation*, 527 F.Supp. 922, 923 (S.D.N.Y.1981). In light of § 5001(a)'s mandatory nature, *see United Bank, Ltd. v. Cosmic International, Inc.*, 542 F.2d 868, 878 (2d Cir.1976); *Menendez v. Saks & Co.*, 485 F.2d 1355, 1374 (2d Cir.1973), *rev'd on other grounds sub nom. Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682, 96 S.Ct. 1854, 48 L.Ed.2d 301 (1976), courts have held that a plaintiff's failure to pursue his request for prejudgment interest during the trial or even to demand such interest in his complaint does not amount to a waiver of his right to interest. *See, e.g., Julien J. Studley, Inc. v. Gulf Oil Corporation*, 425 F.2d 947, 949 (2d Cir.1969); *Mount Sinai Hospital v. Borg-Warner Corporation*, 527 F.Supp. at 924; *First National Bank of Hollywood v. American Foam Rubber Corporation*, 309 F.Supp. 545, 546 (S.D.N.Y. 1969); *see also Flamm v. Noble*, 296 N.Y. at 268–69, 72 N.E.2d 886 (although complaint contained no demand for interest, "[n]othing turns on any such omission in cases where ... the addition of interest to a verdict is a matter of right"); *Buffalo Oil Terminal, Inc. v. William B. Kimmins & Sons*, 42 Misc.2d at 501, 284 N.Y.S.2d 499; 5 J. Weinstein, H. Korn & A. Miller, *supra*, ¶ 5001.15, at 50–38 to –39. Indeed, the only apparent consequence under § 5001 of failing to bring the prejudgment interest question to the attention of the jury is that the judge, and not the jury, will fix the date from which interest is to be computed. N.Y.Civ.Prac.Law § 5001(c); *see Buffalo Oil Terminal, Inc. v. William B. Kimmins & Sons*, 42 Misc.2d at 501, 284 N.Y.S.2d 499; *Julien J. Studley, Inc. v. Gulf Oil Corporation*, 425 F.2d at 949. We hold, therefore, that the plaintiffs have not waived any right to such interest.

■ The pertinent portion of N.Y.Civ. Prac. Law § 5001(a) (McKinney 1963) provides: "Interest shall be recovered upon a sum awarded ... because of an act or omission depriving or otherwise interfering with title to, or possession or enjoyment of, property...." Bankers Trust argues, however, that plaintiffs' state law claims for common law fraud and negligent misrepresentation are not the type of "act of omission" contemplated by § 5001(a) and that, in any event, plaintiffs' loss of the use of funds borrowed from Franklin National was not an interference with "title to, or possession or enjoyment of, property" under § 5001(a), since that statute only encompasses interference with tangible, specific property. Finding to the contrary, we hold that prejudgment interest should have been included in the judgment.

Bankers Trust does not contest the fact that, prior to the effective date of § 5001(a) on September 1, 1963, prejudgment interest was awarded as a matter of right in all actions grounded on intentional torts which interfered with property rights, including common law fraud. *See, e.g., DeLong Corporation v. Morrison-Knudsen Co.*, 14 N.Y.2d 346, 348, 251 N.Y.S.2d 657, 200 N.E.2d 557 (1964); *Flamm v. Noble*, 296 N.Y. at 268, 72 N.E.2d 886. Moreover, the cases did not turn on the kind of property involved or its tangibility or intangibility. *Flamm v. Noble*, 296 N.Y. at 265, 72 N.E.2d 886 ("if a claim for damages represents a pecuniary loss, which may be ascertained with reasonable certainty as of a fixed day, then interest is allowed from that day"); *Adler v. Pilot Industries*, 192 Misc. 774, 775, 81 N.Y.S.2d 822 (Sup.Ct.1948). Although under New York law existing prior to § 5001(a)'s enactment plaintiffs would probably not have been entitled to interest as a matter of right on their negligent misrepresentation claim, *see Purcell v. Long Island Daily Press & Publishing Co.*, 9 N.Y.2d 255, 257–58, 213 N.Y.S.2d 425, 173 N.E.2d 865 (1961) (interest in actions grounded on negligence was left to the discretion of the jury or the court), it is certain that their common law fraud claim would have mandated such an award.

We find little merit to Bankers Trust's contention that a right to interest under the facts of this case does not survive § 5001(a)'s enactment. Indeed, the New

York Court of Appeals has commented that § 5001(a) does not constrict but "expand[s] the right to interest in property damage actions." *DeLong Corporation v. Morrison-Knudsen Co.,* 14 N.Y.2d at 349, 251 N.Y. S.2d 657, 200 N.E.2d 557 (dictum). It has also been said:

CPLR 5001(a) is phrased broadly and is designed to obliterate all distinctions that may turn on the form of the action [*i.e.,* the old distinction between actions grounded on intentional torts and on negligence], . . . the type of property involved, the nature of the encroachment upon the plaintiff's property interests, or the nature of the damages suffered. Thus, interest is available for the tortious interference with intangible, as well as tangible, property whether or not the property has been physically damaged.

5 J. Weinstein, H. Korn & A. Miller, *supra,* ¶ 5001.05, at 50–19 (footnotes omitted), *quoted in part in DeLong Corporation v. Morrison-Knudsen Co.,* 14 N.Y.2d at 349, 251 N.Y.S.2d 657, 200 N.E.2d 557. Courts applying § 5001(a) have without qualification awarded interest as a matter of right whenever any tortious conduct causes pecuniary damage to tangible or intangible property interests. *See, e.g., Buffalo Oil Terminal v. William B. Kimmins & Sons,* 42 Misc.2d at 500–01, 284 N.Y.S.2d 499 (where defendant tortiously damaged storage tank interest allowed on awards both for damage to tank and for loss of rental and use of such tank); *Spector v. Mermelstein,* 485 F.2d 474, 482 (2d Cir.1973) (interest awarded under New York law when defendant's negligence and breach of fiduciary duty in failing to reveal material facts led plaintiff to lend $250,000 to a third party who never repaid loan); *Borrello v. Perera Co.,* 381 F.Supp. 1226, 1232 (S.D.N.Y.1974) (interest awarded under § 5001(a) to maker of checks when defendant converted proceeds of checks on ground that "party to whom money is owed has been deprived of the use of the funds and can be made whole only by the award of interest"), *aff'd,* 512 F.2d 1380 (2d Cir.1975) (per curiam); *Collier v. Granger,* 258 F.Supp. 717, 718 (S.D.N.Y.1966) (interest awarded in securities fraud case

under federal and New York law where plaintiff's investment was lost). Although most of these are federal cases, we believe that their results are consistent with the scope and intent of § 5001(a), especially in light of New York's prevailing policy, interwoven into § 5001, that "[i]nterest must be added [in actions where persons are deprived of the use of money] if we are to make the plaintiff whole." *Prager v. New Jersey Fidelity & Plate Glass Insurance Co.,* 245 N.Y. 1, 5–6, 156 N.E. 76 (1927) (Cardozo, C.J.); *see also* 5 J. Weinstein, H. Korn & A. Miller, *supra,* ¶ 5001.01, at 50–5 to–6. We conclude, therefore, that Bankers Trust's tortious actions resulting in the loss of plaintiffs' loan proceeds were "act[s] or omission[s] depriving or otherwise interfering with title to, or possession or enjoyment of, property" under § 5001(a). Accordingly, we hold that plaintiffs are entitled to prejudgment interest as a matter of right, and we remand to the district court for computation of such interest in accordance with New York law.

Judgment affirmed; case remanded for computation and addition of prejudgment interest.

NEWMAN, Circuit Judge, concurring:

One aspect of this appeal touches upon a significant issue in the administration of justice: whether a discretionary decision of a judge may legitimately be influenced by the amount of time and resources the judicial process has already devoted to a particular case. The problem arose in this litigation at the point where the District Judge was asked by the defendant to exercise his discretion to grant a motion for a new trial. This occurred seven years after the suit had been filed and after two trials had already been held. Judge Carter denied the motion, candidly stating that his exercise of discretion was significantly influenced by the time the case had been pending and its procedural history. Judge Lumbard's opinion for the majority asserts that "the passage of time, by itself, is a consideration which should not have been given any weight in denying the new trial mo-

tion...." At 692. Nevertheless, the majority affirms Judge Carter's denial of the motion, concluding that his mention of the time factor was inconsequential to his ruling. With respect, I do not believe the majority's attempt to disregard the significance of Judge Carter's statement will withstand analysis, and I therefore confront the issue whether his discretion was properly exercised. In my view, the passage of time and the procedural history of the case were legitimate factors for the District Judge to consider. For that reason I concur in the Court's judgment and in all portions of the majority opinion concerning issues other than the denial of the new trial motion.

## I.

There are two strands to the majority's analysis of Judge Carter's ruling on the motion for a new trial. First, the majority views his explanation for his ruling as if he had simply said that, if he had been the trier, he would have differed with the jury's verdict. To this view of the record the majority applies the traditional rule that a trial judge's mere disagreement with a jury's verdict is not a sufficient basis for granting a new trial. The conclusion reached is that whatever Judge Carter said about the passage of time is irrelevant since he did not in any event consider the verdict contrary to the weight of the evidence, the standard that he would have had to find was met before he could have granted the motion. Second, the majority states that on its view of the evidence Judge Carter was not entitled to grant a new trial. This conclusion also renders his reference to the time factor irrelevant. I find both aspects of the analysis flawed, the first because it misinterprets what Judge Carter said and the second because it involves a decision beyond our authority.

Judge Carter first considered defendant's motion for judgment n.o.v. In denying that motion, he noted his disagreement with the verdict, but acknowledged that the evidence sufficed to support the verdict, thereby requiring him to deny the motion for judg-

ment n.o.v. Turning next to the new trial motion, Judge Carter noted that this motion "brings into play other considerations, chief of which is the court's duty to prevent a miscarriage of justice." At that point he cited *Bevevino v. Saydjari*, 574 F.2d 676, 684 (2d Cir.1978). That decision, at the page cited by Judge Carter, concerns the standard for setting aside a verdict as against the weight of the evidence. *Bevevino* noted that a district judge would not be warranted in granting a new trial simply because he disagreed with a jury's verdict, but only if it is " 'quite clear that the jury has reached a seriously erroneous result.' " *Id.* (quoting 6A *Moore's Federal Practice* ¶ 59.08[5] at 59–160—59–161 (1973)). Having thus identified the correct standard, Judge Carter then wrote:

> Under other circumstances I would be inclined to grant defendant's motion, however, this case is seven years old and the recent trial is its third [actually, the second, after an initial dismissal of the complaint]. It has been appealed to the United States Supreme Court once, and the Court of Appeals twice and may be headed there a third time. Although I have serious doubts about the verdict, the fair administration of justice requires that this case remain unsettled no longer. Accordingly, the motion is denied.

It seems clear to me that Judge Carter recognized the correct standard and stated that he would have found the standard met and granted a new trial had it not been for the passage of time and the history of litigation. By referring to a court's duty to prevent a "miscarriage of justice" and expressing his "serious doubts" about the verdict, he did more than merely express disagreement with the verdict, something he had already done in disposing of the motion for judgment n.o.v. In short, the District Judge exercised his discretion significantly, if not decisively, on the basis of the passage of time and the procedural history of the case.

The second aspect of the majority's analysis suggests that even if Judge Carter had expressed an inclination to set aside the

verdict as against the weight of the evidence, he would have erred in doing so. It is not entirely clear whether the majority means that *it* does not consider the verdict contrary to the weight of the evidence or that it would consider it an abuse of discretion if Judge Carter had set aside the verdict as contrary to the weight of the evidence and that such a ruling would have been subject to reversal. Clearly an appellate court has no authority to make its own assessment of whether a verdict is contrary to the weight of the evidence. *See* 6A *Moore's Federal Practice* ¶ 59.08[5] (1983). And, though an order granting a new trial because the verdict is against the weight of the evidence is generally reviewable for abuse of discretion upon appeal from a final judgment, *e.g., Massey v. Gulf Oil Corp.,* 508 F.2d 92 (5th Cir.), *cert. denied,* 423 U.S. 838, 96 S.Ct. 67, 46 L.Ed.2d 57 (1975); *Fireman's Fund Insurance Co. v. Aalco Wrecking Co.,* 466 F.2d 179, 185–87 (8th Cir.1972), *cert. denied,* 410 U.S. 930, 93 S.Ct. 1371, 35 L.Ed.2d 592 (1973), this Circuit has disclaimed the authority to review such a ruling, *Portman v. American Home Products Corp.,* 201 F.2d 847, 848 (2d Cir.1953); *see Compton v. Luckenbach Overseas Corp.,* 425 F.2d 1130, 1132 & n. 2 (2d Cir.) (affirming order denying new trial because verdict not against weight of the evidence), *cert. denied,* 400 U.S. 916, 91 S.Ct. 175, 27 L.Ed.2d 155 (1970).

I therefore conclude that Judge Carter explicitly relied on the passage of time and the procedural history of the case in denying defendant's motion for a new trial and that we cannot ignore the significance of his doing so by ruling that he would have erred had he granted the motion.[1] However, we have not disclaimed the authority to review an order granting or denying a motion for a new trial if the trial judge applied an incorrect standard, *see Compton v. Luckenbach Overseas Corp., supra,* 425 F.2d at 1133. If it really was impermissible for Judge Carter to consider the passage of

time and the procedural history of the case in denying defendant's motion for a new trial, we should remand the matter to him to reconsider the motion in the exercise of his discretion without regard to these factors. Whether these were impermissible factors merits further consideration.

## II.

No doubt it is unsettling to many even to consider whether a judge is entitled to take into account the protracted history of a case in making a discretionary ruling. Our aspirations toward a perfectable system of justice are so deeply ingrained that we tend to recoil at the thought that a ruling a litigant would have received at an earlier stage of litigation may legitimately be denied to him at a later stage, even though his request for relief is timely according to the rules applicable to his motion. It is an instinctive reaction among judges and lawyers that justice must never be sacrificed to expediency, a view that normally favors additional procedures without regard to resulting delays. Underlying this reaction is a perception of justice that focuses solely on the outcome of a particular case and ignores the frequently competing concern for justice in the litigation system as a whole— justice to all those who must suffer further delay and frequently incur further costs, if, for example, a seven-year-old case tried twice receives an eighth year of proceedings and a third trial. *See United States v. United Shoe Machinery Corp.,* 93 F.Supp. 190, 191 (D.Mass.1950) (Wyzanski, J.) ("The Court has obligations to other parties who have cases to be heard."). The issue posed by Judge Carter's ruling is part of the fundamental challenge, too rarely confronted directly, of striking an appropriate balance between the benefits of a meticulous system of litigation, striving to achieve perfection of results, and the costs in time, money, and other resources that such a system entails.

---

**1.** If, contrary to *Portman v. American Home Products Corp., supra,* we could review for abuse of discretion an order setting aside a verdict as against the weight of the evidence, I

doubt whether we would have found an abuse of discretion on this record if Judge Carter had granted a new trial.

It would be too extravagant to maintain that the time and resources already devoted to a single case are not relevant to any aspect of the future course of that litigation. Any trial judge considering the time to allow for various phases of litigation will inevitably weigh the time that has already elapsed. This occurs routinely in setting deadlines for the end of discovery, the start of a trial, the examination of a witness, and, on occasion, the aggregate length of each side's presentation of evidence at trial. These instances pose the issue in relatively easy terms, for the judge is only limiting the amount of time for a future task in light of the time already spent in performing that task. They are qualitatively different from Judge Carter's ruling, which permits the passage of time and the procedural history of a case to influence the resolution of a contested legal claim. Yet the common principle at work must not be overlooked. The party denied requested time to depose an additional witness or present trial testimony may have lost the evidentiary basis for obtaining a legal ruling it might otherwise have secured. The passage of time has contributed to the outcome.

I believe that trial and appellate judges have considered the time and resources already devoted to a case in a variety of situations where the outcome of a ruling is directly implicated. What is rare is for a judge to articulate reliance on these factors. Indeed, some may subconsciously weigh these factors without articulation to themselves. Perhaps that is what is occurring on this appeal when the majority states that Judge Carter may not consider the passage of time in denying a new trial and then affirms his ruling in this case. It is just possible that the majority shares Judge Carter's distaste for a third trial of this case and is willing to view what it regards as an improper ground for the exercise of a trial judge's discretion as less consequential at this late stage of the litigation than it might have been viewed at an earlier stage.

On occasion courts have articulated the significance of the passage of time and the history of a case as a factor influencing the procedural course of litigation. The Supreme Court has undertaken consideration of issues that it would have resubmitted to a court of appeals, but for the need to terminate litigation already many years old. *Consolo v. Federal Maritime Commission,* 383 U.S. 607, 621, 86 S.Ct. 1018, 1027, 16 L.Ed.2d 131 (1966); *O'Leary v. Brown-Pacific-Maxon, Inc.,* 340 U.S. 504, 508, 71 S.Ct. 470, 472, 95 L.Ed. 483 (1951). This Court has redetermined damages, rather than remand to the trial court, in order to conclude protracted litigation. *Chris-Craft Industries, Inc. v. Piper Aircraft Corp.,* 516 F.2d 172, 186–87 (2d Cir.1975), *rev'd on other grounds,* 430 U.S. 1, 97 S.Ct. 926, 51 L.Ed.2d 124 (1977); *Georgia-Pacific Corp. v. U.S. Plywood-Champion Papers, Inc.,* 446 F.2d 295, 299 (2d Cir.), *cert. denied,* 404 U.S. 870, 92 S.Ct. 105, 30 L.Ed.2d 114 (1971).[2] This Court's willingness to determine the damages in *Chris-Craft* is especially instructive. That case did not involve a simple recalculation in light of a disallowed item, but instead required an exercise of the fact-finding responsibility normally entrusted to the district court. In determining a loss of value of shares, the Court decided what the shares were worth before the alleged illegality and their worth thereafter, and in making the latter finding, the Court selected between the conflicting views of expert witnesses. 516 F.2d at 189–90. The Court's opinion explicitly noted that this

---

**2.** To the same effect are *Sauers v. Alaska Barge & Transport, Inc.,* 600 F.2d 238, 247–48 (9th Cir.1979) (because suit was pending eight years appellate court selects appropriate rate of pre-judgment interest to compensate for effect of inflation on damages, instead of remanding to district court), and *Felder v. United States,* 543 F.2d 657, 671 (9th Cir.1976) (because suit was pending seven years appellate court redetermines damage award). *See also* *Pegues v. Mississippi State Employment Service,* 699 F.2d 760, 766 n. 7 (5th Cir.1983) (because of age of lawsuit and death of trial judge appellate court resolves issues on merits not reached by district court); *Weaver v. Marine Bank,* 683 F.2d 744, 748 (3d Cir.1983) (because of age of lawsuit appellate court decides whether to use state procedure for transferring pendent claims to state court, instead of remanding for decision by district court).

displacement of the normal role of a district court, with a resulting damage award not necessarily the same as a district court would have awarded on remand,[3] was influenced by the fact that the case was in its sixth year and on its third appeal to this Court. *Id.* at 186.

Even if the passage of time and the procedural history of a case may appropriately influence some rulings, the question remains whether these are permissible factors to consider in deciding whether to grant a new trial in a civil case on the ground that the verdict is against the weight of the evidence. A party seeking a new trial on this ground has little to complain of if its motion is denied. A jury has already resolved the factual disputes against it, and a judge, in rejecting a motion for judgment n.o.v.,[4] has determined that the evidence was legally sufficient to permit the jury to return the verdict. Whether a trial judge will nevertheless award a new trial not because he simply disagrees with the verdict but because he regards it as against the weight of the evidence as he assesses it is an entirely discretionary matter. In this Circuit the authority to review the grant or denial of such a motion has been explicitly disclaimed. *Portman v. American Home Products Corp., supra.* Even when such a motion is granted, it is generally thought that it will not be granted a second time if the second jury reaches the same verdict as the first jury. "Courts rarely grant a new trial after two verdicts upon the facts in favor of the same party, except for error or law . . . ." *Louisville & Nashville R.R. v. Woodson,* 134 U.S. 614, 623, 10 S.Ct. 628, 631, 33 L.Ed. 1032 (1890). *See* 6A *Moore's Federal Practice* ¶ 59.08[5] (1983). Though

the adoption of that precept in the federal courts has no doubt been influenced by Seventh Amendment considerations, its origin at common law, *see* Graham, *New Trials* 541 (1834), reflects the need to bring litigation to a conclusion, even if the result remains judicially viewed as unjust. Such an approach, as Holmes observed in the context of limiting trial length, is simply "a concession to the shortness of life." *Reeve v. Dennett,* 145 Mass. 23, 28, 11 N.E. 938, 944 (1887).

Not only is a trial judge's discretion at its fullest when deciding whether a verdict is against the weight of the evidence, but the passage of time has a special pertinence to the exercise of that discretion. Since the judge is not rendering judgment for the moving party but simply giving it the opportunity to have another jury weigh the evidence, a judge granting the motion presumably believes that there is some greater likelihood that a second jury will return a verdict in accord with his view of the weight of the evidence. Time has a bearing on that likelihood. With the passage of time, recollections fade, and ascertainment of facts becomes more difficult. Thus, in this case, Judge Carter was entitled to consider not only whether the verdict was against the weight of the evidence but also whether, in view of the age of the litigation, there was sufficient likelihood that another jury would return a "better" verdict.

Even though it is not the fault of the defendant that this case has already been tried twice and had been pending seven years when Judge Carter ruled, I think he was entirely warranted in taking into

---

**3.** The Court adopted an approach that virtually ensured that its damage award would not be the same as the figure the District Judge would have awarded. In revising upwards to more than $25 million a $1.6 million damage calculation of the District Court that was too low, the Court stated that the upper limit of its redetermination would be the minimum amount that the District Court could have awarded without committing reversible error, *Chris-Craft Industries, Inc. v. Piper Aircraft Corp., supra,* 516 F.2d at 187. Had the matter been remanded, the District Court, advised of this Court's view

of the legal principles, would have been entitled to award damages between the minimum and maximum amounts that could have been awarded without committing reversible error.

**4.** There is no suggestion that Judge Carter permitted the passage of time or the procedural history of the case to influence his ruling on defendant's motion for judgment n.o.v., a nondiscretionary ruling on an issue of law and one that entailed no risk of further trial court proceedings whichever way he ruled.

account the age of the case and its procedural history. His denial of the Rule 59 motion was a commendable invocation of the command of Rule 1 that the civil rules be construed "to secure the just, speedy, and inexpensive determination of every action." *Fed.R.Civ.P. 1.* I applaud Judge Carter for candidly stating what influenced his ruling on the new trial motion, and I join the majority in affirming his denial of that motion.